ATL, INC.

v.

The UNITED STATES.

No. 442–83C.

United States Claims Court.

Aug. 9, 1983.

See also, 3 Cl.Ct. 49, 3 Cl.Ct. 52.

Herman M. Braude, Washington, D.C., attorney of record, for plaintiff; Gerson B. Kramer, Douglas L. Patin and Braude, Margulies, Sacks & Rephan, Chartered, Washington, D.C., of counsel.

Lenore C. Garon, Washington, D.C., with whom was Asst. Atty. Gen. J. Paul McGrath, Washington, D.C., for defendant.

## OPINION

PHILIP R. MILLER, Judge:

### The Posture of the Litigation

This is a suit to enjoin the Navy Department from denying to the plaintiff its rights as low bidder on four construction contracts. Jurisdiction is asserted under Title 28 U.S.C. § 1491(a)(3) (1982) as added by the Federal Courts Improvement Act of 1982, Pub.L. 97–164, Title I, § 133(a), 96 Stat. 25, 39.

The Office in Charge of Construction for the Mid-Pacific Region of the United States Navy (OICC MIDPAC or OICC) issued four invitations for bids for construction work in the vicinity of Honolulu, Hawaii, on each of which plaintiff was the low bidder as set out below:

| Invitation Number | Issue Date | Bid Opening Date | Amount of Plaintiff's Low Bid |
|---|---|---|---|
| (1) IFB No. N62471–81–B–1458 (Electrical Power Improvements) | Jan. 21, '83 | Mar. 2, '83 | $2,248,888 |
| (2) IFB No. N62471–81–B–1481 (Repair of Supply Wharf K–9) | Jan. 28, '83 | Mar. 2, '83 | 738,888 |
| (3) IFB No. N62471–81–B–1528 (Demolition of Third Floor and Roofing of Second Floor, Building 474) | Feb. 11, '83 | Mar. 11, '83 | 518,888 |
| (4) IFB No. N62471–80–C–1452 (Modernization of Hale Moku Housing) | Mar. 3, '83 | Apr. 22, '83 | $1,991,849 plus alternate work $57,039 |

On July 6, 1983, plaintiff filed its complaint alleging that after an unusually long period of time the Navy had failed to act on plaintiff's bids but had requested plaintiff to extend the 60 day lives of its bids for successive periods of time, which at that time was up to July 31, 1983, for the first three invitations and August 20, 1983, for the fourth. Plaintiff complained that the Navy had violated its own Defense Acquisition Regulations DAR 1–905.2 (32 C.F.R. § 1–905.2 (1982)), by failing to obtain promptly information as to plaintiff's responsibility (including a pre-award survey) and by failing to make a prompt responsibility determination. It asserted that the Navy delayed requesting all of the information it deemed necessary on all four contracts until July 1, 1983, 4 months after the bid openings on two of the contracts, 3½ months after the bid opening on the third and more than 2 months on the fourth. It contended that such delays were unreasonable and that the Navy's failure either promptly to award it the contracts or else to reject its bids upon a determination of nonresponsibility so that it could obtain review of such determination by the Small Business Administration (SBA), pursuant to 15 U.S.C. § 637(b)(7) (1982), was arbitrary and capricious conduct which threatened to cause it irreparable harm, in that, as a small business: (1) its bonding capacity and ability to bid on other government contracts had been severely limited by the Navy's nonaction on plaintiff's low bids, which were already bonded; (2) its cash flow was being severely impacted; and (3) it was being denied the profits to which it was entitled as low bidder on the four contracts.

It asked that the court impose a July 21, 1983, cut-off date on the Navy's conducting of any further responsibility review and for the making of a responsibility determination with respect to plaintiff and the four solicitations, and, in the event it finds plaintiff nonresponsible for performance of any of the four contracts, that it refer the issue to SBA. Plaintiff accompanied the complaint by motions for temporary restraining order and preliminary injunction.

On July 12, 1983, the court, 3 Cl.Ct. 52, denied the motion for temporary restraining order but set the case for trial on Monday, July 18, 1983, to afford plaintiff an opportunity to prove, if it could, that the Navy's delays in acting on the awards on the four solicitations on which plaintiff was the lowest bidder was a prolonged *de facto* debarment or suspension of plaintiff from all contract awards without compliance with the applicable regulations and without giving plaintiff notice of the stigmatizing charges underlying it and an opportunity to respond to them.

However, shortly prior to trial, by letters dated July 15, the Chief of Naval Material formally notified the plaintiff's principal officers that the Navy "is suspending you and your companies * * * from contracting with any agency in the executive branch of the Federal Government."

On the same day, the Navy awarded contracts on three of the four solicitations (Nos. 2, 3 and 4) to the second lowest bidders.

As a result, on July 18, 1983, the court, 3 Cl.Ct. 49, issued an order to the Department of the Navy and its officers, agents and employees: temporarily enjoining the award to anyone other than plaintiff of any of the four solicitations not already awarded; but in the event any of them had been so awarded, enjoining the direction or permission to perform any work under contracts awarded pursuant to such solicitations. Such injunctions were to expire automatically upon the filing of an opinion and judgment on the merits by the court.

### Facts

Plaintiff is a construction contractor operating almost entirely on the island of Oahu in Hawaii. It is a small business concern, as defined in the Small Business Act. 15 U.S.C. § 632 (1982). Almost all of its business is done with the federal government. Prior to bidding on the four contracts at issue in this case, ATL had been awarded 22 government contracts with a total value in excess of $25 million during the period of time from February 18, 1976

through September 27, 1982, of which 85 percent were performed for the Navy. OICC MIDPAC had previously awarded to ATL six contracts with a total value between $10 and $15 million.

Toward the end of 1982 or beginning of 1983, charges alleging misconduct by ATL in the performance of ongoing and prior contracts came to the attention of Navy Captain Michael M. Dallam, chief of OICC MIDPAC, as a result of which, in January or February 1983, he referred the matter to the Naval Investigating Service (NIS) and the latter in turn referred the matter to the Federal Bureau of Investigation (FBI) and the United States Attorney in Hawaii for joint investigation.

At about the same time Captain Dallam made such charges known to various members of his OICC staff: Jeffrey Wayne, his counsel, Commander Frederick Messick, his deputy, and Mr. Noriyoshi Masumoto, director of the contracts division. Wayne was instructed to keep in touch with the progress of the investigation and to report on it to Captain Dallam periodically.

The bids for the first two contracts involved in this suit, the electrical power improvements and the wharf repairs, were opened on March 2. The following day, OICC sent ATL, a letter requesting that it confirm its low bids on the two solicitations as not being the results of errors, and on March 10 the contractor complied.

Both the law (10 U.S.C. § 2305(c) (1982)) and the applicable regulations (32 C.F.R. § 1–902 (1982)) require that contract awards be made only to responsible bidders, and responsibility includes, among other things, "a satisfactory record of integrity" (32 C.F.R. § 1–903.1 (1982).)

When ATL was identified as the low bidder on the two solicitations it was recognized by the OICC that, while the pre-award surveys should address all of the issues normally examined during this process, there was also a body of allegations and information regarding ATL's integrity which was already under investigation. At that point it was not yet clear to OICC as to what the results of the investigation would

be: whether criminal action or a recommendation for suspension of ATL would be initiated; whether the information might be considered as a part of the pre-award survey responsibility determination; or whether the investigation would be found fruitless and the charges dropped. However, it was also realized that the pre-award survey process must at some point consider the results of these investigations, since it might influence the evaluation of the contractor's integrity or management ability. But since Mr. Wayne reported that the investigations would not be at the stage where their findings could be considered in the pre-award surveys until some time in April, it was recognized by the OICC that the pre-award surveys could not be concluded until late April or early May. Accordingly, until that point was reached Mr. Masumoto was assigned to pursue solely the other facets of the pre-award survey.

Mr. Masumoto maintains a reference file containing evaluations of the past performance of contractors who have previously performed work for OICC. Shortly after opening ATL's low bid he consulted his brochure on ATL. ATL's evaluations included one by Captain Eber, Captain Dallam's predecessor, dated 1981, which stated that ATL's performance was outstanding. The file also contained ratings of ATL's performance which were merely satisfactory and one which was unsatisfactory. After Masumoto read this file, he contacted the resident officers in charge of construction (ROICCs) in the field and asked for their evaluations of ATL's current performance. Their responses did not provide a basis for any definite conclusions and Masumoto did not investigate the matter any further at that time.

In April, Mr. Wayne reported to Captain Dallam and Commander Messick that the criminal investigation of ATL would not be completed until some time in May.

As the 60-day period for expiration of the validity of the March 2 bids approached, on April 29, Messrs. Masumoto, Wayne, Messick and Dallam met to discuss the situation. Mr. Masumoto, following his usual

form of many years for recommendations, reported that on the basis of his pre-award survey he had no information which would preclude award of the electric power improvements and wharf repair contracts to ATL.

Normally, when Masumoto reported that he had found nothing to preclude an award, Captain Dallam would not ask any further questions. According to Dallam, it was only in rare cases that he would even see the pre-award survey. These surveys would only come to this attention if there was a public interest, or he had expressed interest in the contract, or his subordinates felt that the issues involved were sensitive enough to merit his attention. In this instance, however, Captain Dallam was not satisfied with Masumoto's normal recommendation. He stated that he wanted a positive recommendation and an affirmative decision that ATL was responsible in all areas. Also because of the significant difference between ATL's low bid and the government's higher prebid estimate, despite ATL's having already confirmed its bids, Dallam wanted to be reassured that there was no misinterpretation of the specifications or a different understanding of the work required, to prevent a later claim of error by the contractor.

As a result of this instruction, on May 2, 1983, Commander Messick addressed letters to ATL with respect to both the electric power improvements and wharf repair projects requesting that ATL extend the acceptance period of its bids from 60 to 120 days after bid opening. And they both further stated that in order to preclude any misunderstanding as to the work required and to assure the government of ATL's ability to perform the work at the price bid, ATL submit a breakdown of its bid by major elements for the purpose of comparing it against the government estimate. It also requested that ATL submit its proposed plan for the performance and management of the work on the ground that its experience with OICC MIDPAC did not include any work of a similar nature.

On May 5, the Navy received ATL's price breakdowns and plans of operation for the electrical power and wharf repair contracts, as requested in the May 2 letter, and forwarded them to its Construction Division for analysis. On May 15, the Construction Division reported that ATL's plans of operation for the electrical power and wharf repair contracts were generally acceptable.

ATL's bid breakdowns were not sent to the Design Division for analysis until May 23, 18 days after receipt. On June 3, the Design Division reported that two items on the wharf repair contract differed substantially from the government's estimate and that this appeared to be a bid error or a misinterpretation of the scope of the work.

In the meantime, on March 11, bids were opened on the third contract, for demolition of a building. A company named Triax was the low bidder and ATL was the second low bidder, but on March 14 the OICC received a letter from Triax requesting that it be allowed to withdraw its bid because of an error made in its bid preparation. Although the withdrawal of Triax's bid was not approved until May 2, by the end of March it appeared that ATL might be entitled to this contract too. On March 29 the OICC sent ATL a letter requesting that it confirm its bid on the project, and ATL did so by April 5.

On May 6, the Navy requested that ATL likewise extend its bid on the demolition contract for 60 days, until June 30.

On April 22, bids were opened on the fourth contract, for modernization of the Hale Moku housing project, and again ATL was the low bidder.

During the middle of May, Masumoto determined that there were no outstanding questions as to ATL's experience and ability to perform the demolition and the Hale Moku contracts. However, these two contracts were not awarded to ATL separately because to the extent that ATL was low bidder on all, OICC decided to deal with all four contracts concurrently.

Mr. Wayne reported to Captain Dallam in May that the U.S. Attorney intended to

submit the ATL case to a grand jury, but as the month continued such action was not immediately forthcoming.

Sometime during the last week in May, Captain Dallam decided to form a pre-award survey team to study the issue of ATL's technical ability to perform all the contracts. According to Captain Dallam, he took this action because he felt that Mr. Masumoto's workload was too heavy and that his office had insufficient resources to make an affirmative determination on all issues concerning ATL's responsibility.

Although Captain Dallam had been given reason to believe that the evidence gathered by the investigators would be presented shortly to a grand jury, as the first half of June drew to a close no such presentation took place. It became apparent to him that the extended technical evaluations of ATL's competency were nearing completion and that award on some or all of the contracts on which ATL was the low bidder could not be delayed until an indictment was secured. On June 15, Mr. Masumoto was required to ask ATL to extend its bid on the Hale Moku housing project for an additional 60 days, until August 20.

On June 16, in the company of Mr. Wayne, Captain Dallam visited the U.S. Attorney in Honolulu, to ascertain the status of the investigation and the extent to which the investigators would release their information for use by OICC to disclose to ATL as a part of its responsibility determination. The U.S. Attorney advised him that the criminal investigation of ATL would continue for several months and that an indictment was not imminent. Although OICC was free to take such action as it deemed necessary with respect to ATL's low bids, the U.S. Attorney cautioned Captain Dallam against the premature disclosure of evidence which might be useful if a criminal prosecution was instituted later.

In view of that advice, on the same day Captain Dallam instructed Mr. Wayne to prepare a recommendation and package of supporting documents for submission to his Navy superiors in Washington for the suspension of ATL from all government con-

tract awards for lack of integrity. According to Captain Dallam it was his intention, although he did not make it clear to Wayne, that when the recommendation was completed he would review the package and then decide whether to use the information therein as the basis for suspension or merely as a basis for rejection of ATL's bids for nonresponsibility for lack of integrity. Since the latter would require disclosing the evidence to ATL, his "key concern" in deciding whether or not to take the latter action was whether he could compile enough information which the NIS and U.S. Attorney would clear for release to the contractor as not jeopardizing the success of any possible future prosecution.

Also on the same day, June 16, the Navy received a letter from ATL asking for information about the delay in the awards of the four contracts and requesting that a meeting be arranged for June 21. In lieu of granting such a meeting, on June 17 Captain Dallam and Commander Messick asked Masumoto to request additional detailed information from ATL on all four bids. The information requested was ATL's proposed plan to provide adequate staffing for superintendents and quality control, demonstrating how quality control would be maintained at each project, the proposed manning of each project, an integrated time schedule for each project, a description of all of the work to be performed by ATL during the anticipated performance of the four contracts, all quality control plans involving subcontractors and their duties, and various other information. In this letter, the Navy first expressed its concern as to ATL's ability to perform all four contracts concurrently.

The Navy received ATL's response to its inquiries on June 22. According to Mr. Masumoto, the response answered the questions in considerable detail. Nevertheless on June 22, OICC asked ATL to extend its bid on the electrical power and wharf repair contracts for another 30 days, until July 31, and on July 1 OICC wrote ATL another letter scheduling a meeting for July 6 to obtain further details and clarification as to

how ATL proposed to perform the contracts.

Still highly sensitive to the concerns of the U.S. Attorney, who did not want any integrity information the investigators had compiled released to ATL, on June 23 Captain Dallam met with representatives of SBA to inquire whether if he rejected ATL's bids for nonresponsibility due to lack of integrity and ATL appealed the rejection to SBA, the reasons and evidentiary basis for the rejection would be disclosed by SBA to ATL so that the contractor would have an opportunity to explain or respond. Upon ascertaining that SBA would make such record available to the contractor, Captain Dallam was confirmed in his conclusion that he should recommend suspension of the contractor rather than rejection of its four bids, because upon suspension the bidder could be disqualified from all awards without having to disclose either to it or to the SBA evidence that could be used in any later criminal prosecution. (*See* DAC # 76–41, §§ 1–601.1, 1–603.1, 1–605.2(a) (27 December 1982); adopted on an interim basis 47 Fed.Reg. 37476 (August 26, 1982); adopted as final action 48 Fed.Reg. 9146 (March 3, 1983) (to be codified at 32 C.F.R. § 1–600 *et seq.*) (hereinafter cited as DAR 1–600 *et seq.*) and 32 C.F.R. § 1.705.4(c)(6) (1982).)

On July 1, Captain Dallam sent forward to his superiors his recommendation that ATL be suspended.

During the week of July 5, Captain Dallam asked Mr. Sasaki, Masumoto's assistant, to prepare pre-award surveys on the second low bidders on all four projects. For the bidders on three of these contracts, they were able to determine affirmatively their responsibility merely from the brochure files and reports from ROICCs.

On July 6, ATL had a meeting with the OICC officials. As a result of this meeting, all technical problems with regard to wharf repair, demolition, and Hale Moku contracts were resolved favorably to ATL, although the Navy still had questions concerning ATL's ability to perform the electrical power contract. No mention was made of the pending recommendation for suspension for lack of integrity.

On July 15, Admiral J.G. Williams Jr., Chief of Naval Material issued the suspension letters to ATL and its officers. The letters stated that the Navy was suspending them from contracting with any agency in the executive branch of the federal government "Pending completion of the ongoing investigation and such legal proceedings as may ensue therefrom." The suspension was stated to be based on "adequate evidence" of irregularities of a serious nature committed by plaintiff in the performance of Navy contracts, and it further stated the admiral's findings that the allegations reflected "conduct which demonstrates a lack of business integrity and honesty." It further informed them that—

> While no factfinding proceeding will be conducted as the result of a request from the United States Attorney in Hawaii, under the provisions of the Defense Acquisition Regulation you may present information in opposition to this suspension in person, in writing, or through representation as set forth in DAR 1–606.-3(c)(5). Such information in opposition, if any, must be presented within 30 days from receipt of this letter unless additional time is requested and granted.

The specific conduct which was the basis of the suspension order consisted of nine items, in a three page enclosure, which may be briefly described as follows:

(1) and (2) knowingly submitting false statements of wages paid to employees engaged in work on two different government contracts in 1979 and 1980, in violation of the Davis-Bacon Act;

(3) knowingly understating the amount of a subcontractor's rebate on a partial termination of a contract for the convenience of the government in 1982;

(4) knowingly understating the amount of a subcontractor's credit attributable to the deletion of work by a change order in 1981;

(5) billing for installation of high grade redwood lumber when the contractor actually used an inferior grade;

(6) billing the government for wall insulation required by specifications, but which was never actually installed and its absence concealed;

(7) billing the government for shaft walls enclosing air-conditioning ducts which were never actually installed;

(8) falsely stating that the contractor would be performing at least 20 percent of the work on a contract with its own personnel, but actually performing less than one percent itself; and

(9) billing the government for certain nonconforming materials which the company knew did not conform to the contract specifications.

All of the events surrounding the charges listed in the suspension letter were known to Captain Dallam by May 1983; but in no instance was ATL told that they would form the basis for a charge of lack of integrity or fraud or given the opportunity to explain them prior to the issuance of the suspension order. At trial however, plaintiff's contract quality control representative, and its president, James E. Busher, gave testimony under oath with respect to each of the foregoing items, which, if heard previously and if believed, could have exculpated the plaintiff from such charges.[1]

### Discussion

Title 28 U.S.C. § 1491(a)(3) provides that "To afford complete relief on any contract claim brought before the contract is awarded, the court shall have exclusive jurisdiction to grant declaratory judgments and such equitable and extraordinary relief as it deems proper, including but not limited to injunctive relief." Other than the admonition that in exercising such jurisdiction "the

court shall give due regard to the interests of national defense and national security", the section does not set forth substantive standards for the granting of such equitable relief.

The legislative committee reports on the Federal Courts Improvement Act of 1982, 96 Stat. 25, 39, provide some very general guidance. The House Committee report states that in the vast majority of circumstances the government must be permitted to exercise its right to conduct business in an expeditious manner with the suppliers it selects. "Yet, at the same time the Government must respect the rule of law" and "[i]f it deviates from that norm it must be accountable for its actions in the courts." The rule of law to which it refers is apparently not a single rule nor a new rule, since the committee states that by the conferring of this jurisdiction upon the Claims Court it "does not intend to alter the current state of the substantive law in this area." But at the same time it states its expectation that the court will utilize its authority only in truly extraordinary circumstances, as is required for the granting of equitable relief in all cases. (H.Rep. No. 312, 97th Cong., 1st Sess., 43–44.)

The Senate Committee report asserts that it too does not intend to alter the current state of the substantive law in the area. In explanation of this it states that "Specifically, the *Scanwell* doctrine as enunciated by the D.C. Circuit Court of Appeals in 1970[2] is left intact." And it adds its expectation that the court will utilize the authority conferred by the section "only in circumstances where the contract, if awarded, would be the result of arbitrary or capricious action by the contracting officials, to deny qualified firms the opportunity to complete fairly for the procurement award." (S.Rep. No. 275, 97th Cong., 1st

---

**1.** No findings are made here with respect to the truth of the charges or the denials and explanations because it was not within the scope of the issues tried, and because of the inadequate time to prepare for their refutation between the issuance of the suspension letter on July 15 and the commencement of trial scheduled for July

18. Moreover, the trial was held in Washington, D.C., and the plaintiff's records were located in Honolulu.

**2.** *Scanwell Laboratories, Inc. v. Shaffer,* 424 F.2d 859 (D.C.Cir.1970).

Sess. 23, *reprinted in* No. 2 U.S.Code Cong. & Ad.News 11, 33 (Apr. 1982)).

Thus it may fairly be inferred that Congress intended that in deciding whether or not to grant equitable relief the court consider and determine—

1. Whether or not there has been a failure to respect the rule of law.

2. Whether the contracting officer's proposed award would otherwise be contrary to the substantive law as laid down in *Scanwell* and the line of cases in the Court of Appeals for the D.C. Circuit which have applied its rule.

In *Scanwell*, 424 F.2d at 874, the court held that the discretionary acts of a procurement officer are subject to review pursuant to the standards set forth in the Administrative Procedure Act at 5 U.S.C. § 706(2)(A) (1982). That subsection, and others obviously equally applicable, provide as follows:

The reviewing court shall—

\*     \*     \*     \*     \*     \*

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law \* \* \*.

■ The due process clauses of the fifth and fourteenth amendments require that a determination by governmental authority stigmatizing a person as so lacking in integrity that he is to be deprived of property or the liberty to enjoy rights which he would otherwise enjoy must be preceded by written notice of the facts upon which the charge is based and a reasonable opportunity to submit facts in response. *Perry v. Sindermann,* 408 U.S. 593, 601–03, 92 S.Ct. 2694, 2699–700, 33 L.Ed.2d 570 (1972); *Board of Regents v. Roth,* 408 U.S. 564, 573,

92 S.Ct. 2701, 2707, 33 L.Ed.2d 548 (1972); *Old Dominion Dairy Products, Inc. v. Secretary of Defense,* 631 F.2d 953, 968–69 (D.C. Cir.1980); *Myers & Myers, Inc. v. United States Postal Serv.,* 527 F.2d 1252, 1258–60 (2nd Cir.1975).

■ That a person whose business or livelihood is largely dependent upon government contracts is entitled to procedural due process, including the right to notice of specific charges and opportunity to present evidence *before* he can be blacklisted or barred from securing such contracts for actions demonstrating lack of integrity is established by a series of decision of the U.S. Court of Appeals for the District of Columbia.

In *Gonzalez v. Freeman,* 334 F.2d 570 (D.C.Cir.1964), the court ruled that although authority for debarment of a contractor for 5 years from participating in contracts with the Commodity Credit Corporation for fraudulent acts could be inferred from the act setting up the corporation (15 U.S.C. § 714 (1958)), to avoid constitutional infirmity, requirements of prior notice, fair hearing and findings also had to be read into the statute. Then Judge (now Chief Justice) Warren Burger wrote for the court (334 F.2d at 574):

[T]o say that there is no "right" to government contracts does not resolve the question of justiciability. Of course there is no such *right;* but that cannot mean that the government can act arbitrarily, either substantively or procedurally, against a person or that such person is not entitled to challenge the processes and the evidence before he is officially declared ineligible for government contracts.

and (334 F.2d at 578):

On this record there is neither the appearance nor the reality of fairness in the process by which debarment of appellants was accomplished. Disqualification from bidding or contracting for five years directs the power and prestige of government at a particular person and, as we have shown, may have a serious economic

impact on that person. Such debarment cannot be left to administrative improvisation on a case-by-case basis. The governmental power must be exercised in accordance with accepted basic legal norms. Considerations of basic fairness require administrative regulations establishing standards for debarment and procedures which will include notice of specific charges, opportunity to present evidence and to cross-examine adverse witnesses, all culminating in administrative findings and conclusions based upon the record so made.

In *Gonzalez,* the court noted that conceivably a *temporary* suspension for a reasonable period pending investigation prior to hearing might be constitutionally permissible in some circumstances "when procedural safeguards are accorded before a final decision is reached", but that how long a temporary suspension could be sustained would depend upon the need and other circumstances. However, it found it unnecessary to decide that question in that case.

*Gonzalez* was followed by *Horne Brothers, Inc. v. Laird,* 463 F.2d 1268 (D.C.Cir. 1972), which did discuss the minimum rights to which a contractor was entitled upon a suspension. There, on December 14, 1971, the Navy sent Horne Brothers a notice of suspension pending completion of investigation and of such legal proceedings as may ensue, for conduct indicating a lack of business integrity. Thereafter, on January 5, 1972, the Navy held a bid opening for a contract for the repair of naval vessels, and found Horne Brothers to be the lowest bidder. On January 7 it rejected such bid because of the prior suspension. The district court issued a preliminary injunction directing the government to order the cessation of work on the contract by another.[3]

On appeal, the court reversed the preliminary injunction because it appeared that Horne Brothers was not likely to prevail on the merits, but, because its decision could not dispose of the case and the district court required guidance on remand, it examined what it described as the "serious and funda-mental questions regarding the fairness of procedures utilized by the Government in suspending contractors" (463 F.2d at 1269). It stated as a general proposition (463 F.2d at 1271):

While *Gonzalez* related to a five year disqualification, we think an action that "suspends" a contractor and contemplates that he may dangle in suspension for a period of one year or more, is such as to require the Government to insure fundamental fairness to the contractor whose economic life may depend on his ability to bid on government contracts. That fairness requires that the bidder be given specific notice as to at least some charges alleged against him, and be given, in the usual case, an opportunity to rebut those charges.

It suggested that generally a temporary suspension for a short period, not to exceed 30 days, without notice and opportunity to rebut charges may be acceptable, but that the extent of the delay and the limitation on the kind of evidence the government may be required to produce to comply with due process and the requirement of the regulation that there be "adequate evidence" to support the suspension order is a question of judgment. On the one hand, such judgment may take into account the government's interest in national security and possible prejudice to prosecutorial action against the contractor; but, on the other hand, it may not simply ignore "the possibility of a legitimate interest in an opportunity for the contractor to be heard." (463 F.2d at 1272.) Since the bid opening and rejection of Horne's bid took place only three weeks after it was suspended, the court found no deprivation of Horne's rights to due process in the failure to afford it a hearing prior to that time.

*Horne Brothers* was followed by *Old Dominion Dairy v. Secretary of Defense,* 631 F.2d 953 (D.C.Cir.1980). There, an auditor had reported that the contractor had knowingly and substantially overbilled the government for milk products delivered to

---

3. *Horne Brothers, Inc. v. Laird,* 342 F.Supp. 703    (D.D.C.1972).

the Air Force bases and thereby demonstrated "an unsatisfactory record of integrity." As a result of this report being placed in the Air Force file on the contractor, despite its low bid Old Dominion was rejected for awards for two other contracts as nonresponsible due to lack of a satisfactory record of integrity. However, they failed to give Old Dominion notice of specific instances of such lack of integrity. When Old Dominion brought suit for an injunction claiming that there was no basis for the finding of lack of integrity, that it had been denied due process by the manner in which its bids had been rejected, and that it was entitled to the awards, on the morning of the hearing it was notified that it was formally suspended under DAR 1–605 from being awarded any contracts by the Department of Defense.

The district court found that there was a reasonable basis to justify the actions of the contracting officers. On appeal, the circuit court first ruled that there were no grounds for overturning that finding. Nevertheless, it reversed the district court because (631 F.2d at 955–56)—

> [W]e hold that when the Government effectively bars a contractor from virtually all Government work due to charges that the contractor lacks honesty or integrity, due process requires that the contractor be given notice of those charges as soon as possible and some opportunity to respond to the charges before adverse action is taken.

The court's rationale was: First, as decided in *Gonzalez,* the corporation had a constitutionally protected liberty interest not to be barred from government contracts, of which it could not be deprived other than by due process of law. Second, the stigmatizing of plaintiff as lacking in integrity

and as having knowingly overbilled the government, resulting in the loss of government business upon which it had relied, inflicted cognizable injury upon the plaintiff. Third, the making of the adverse determinations without prior notice to plaintiff of the specific charges and without giving it any opportunity to respond to them was without due process of law. Fourth, the invoking of suspension procedures after the fact could not validate the procedures whereby the plaintiff lost its contracts before suspension.[4] Fifth, the suspension procedures were inadequate to satisfy the requirement of due process, since the regulations did not provide for specific notice of the charges against the contractor and a hearing might or might not occur.[5] In summary, the court stated (631 F.2d at 968):

> [D]ue process in this case includes the right to be *notified* of the specific charges concerning the contractor's alleged lack of integrity, so as to afford the contractor the opportunity to respond to and attempt to persuade the contracting officer, in whatever time is available, that the allegations are without merit. This requirement to give notice will impose absolutely no burden on the Government. Since a determination that a contractor lacks integrity may not be made without reference to specific charges or allegations, it will impose no burden on the Government to notify the contractor of those charges. In so doing, the contractor will at least have the *opportunity* to explain its actions before adverse action is taken. In this way, a simple misunderstanding or mistake may be clarified before significant injury is done to *both* the Government and the contractor. (Emphasis in original.)

4. The court stated (631 F.2d at 966–67):
   In such a case, the Government cannot invoke suspension procedures after-the-fact and claim that those procedures are adequate. The injury complained of in this case is the loss of contracts before Old Dominion was ever suspended, *not* the loss of contracts after suspension but before suspension procedures were able to be implemented. (Emphasis in original.)

5. The court explained that:
   Although a *request* for a hearing may be made (DAR 1–605.3), that request may be denied if a hearing would "adversely affect possible civil or criminal prosecution." (DAR 1–605.2). (Emphasis in original.)
   (631 F.2d at 967, n. 26 and 959, n. 10.)

In *Myers & Myers, Inc. v. United States Postal Service,* 527 F.2d 1252 (1975), the Court of Appeals for the Second Circuit held that although the Postal Service was free to refuse to renew contracts for the transportation of mail between post offices at will, it could not engage in *de facto* debarment as part of a sanction for claimed irregularities without a prior hearing, since "[d]enial of notice and hearing before debarment would 'give rise to serious constitutional issues.'" (527 F.2d at 1259, quoting in part from *Gonzalez v. Freeman,* 334 F.2d at 579.)

In *Art-Metal-USA, Inc. v. Solomon,* 473 F.Supp. 1 (D.D.C.1978), the district court followed the foregoing appellate decisions, reiterating that "due process of law requires that before a contractor may be blacklisted (whether by debarment or suspension) he must be afforded specific procedural safeguards, including, *inter alia,* a notice of the charges against it, an opportunity to rebut those charges and, under most circumstances, a hearing." (473 F.Supp. at 4.) With respect to the argument that suspension could be imposed prior to a hearing, the court stated (473 F.Supp. at 6):

> Defendants alternatively argue that, at a minimum, it is not unlawful to hold up contract awards during the pendency of an investigation into wrongdoing. While this issue is not free from doubt, the Court is willing to assume that, although the regulations do not so provide, it may be lawful in exceptional circumstances to suspend a contractor temporarily pending an investigation. However, both case law and common sense dictate that the exception is a narrow one, and that a departure from the regulatory requirements may be countenanced only in extreme situations such as those involving national security, and then only for a limited time. * * * That is not this situation.

And (473 F.Supp. at 8)

> [O]ur system of laws does not operate on the principle of the Queen in *Alice in Wonderland*—'Sentence first—verdict afterwards.'"

*Accord Peter Kiewit Sons Co. v. U.S. Army Corps of Eng'rs,* 534 F.Supp. 1139, 1153 (D.D.C.1982).

In light of the foregoing authorities there can be little doubt that if the Navy had rejected plaintiff's bids directly on some or all of the four solicitations for nonresponsibility based on lack of integrity, plaintiff would have been entitled to a hearing which would have included at the minimum fair disclosure of the allegations against it and an opportunity to rebut or explain them away to the contracting officer prior to the time when he made his decision.

Defendant concedes that plaintiff is entitled to a hearing on the charges of lack of integrity but asserts that the Navy is offering one to plaintiff—as a part of the post-suspension proceedings before the Chief of Naval Material. Plaintiff correctly points out, however, that the hearing is inadequate because even if it is completely exculpated of the charges against it, as a result of the Navy's haste in awarding three of the four contracts and threatening to award the fourth to other it will in any event have lost $5.5 million in contracts on which it was low bidder. *See* DAR 1–606.

In *Mathews v. Eldridge,* 424 U.S. 319, 333, 96 S.Ct. 893, 902, 47 L.Ed.2d 18 (1976), the Supreme Court stated:

> This Court consistently has held that some form of hearing is required before an individual is finally deprived of a property interest. *Wolff v. McDonnell,* 418 U.S. 539, 557–558 [94 S.Ct. 2963, 2975, 41 L.Ed.2d 935] (1974). See, *e.g., Phillips v. Commissioner,* 283 U.S. 589, 596–597 [51 S.Ct. 608, 611, 75 L.Ed. 1289] (1931). See also *Dent v. West Virginia,* 129 U.S. 114, 124–125 [9 S.Ct. 231, 234, 32 L.Ed. 623] (1889). The "right to be heard before being condemned to suffer grievous loss of any kind, even though it may not involve the stigma and hardships of a criminal conviction, is a principle basic to our society." *Joint Anti-Fascist Comm. v. McGrath,* 341 U.S. 123, 168 [71 S.Ct. 624, 646–47, 95 L.Ed. 817] (1951) (Frankfurter, J., concurring). The fundamental requirement of due process is the oppor-

tunity to be heard "at a meaningful time and in a meaningful manner." *Armstrong v. Manzo,* 380 U.S. 545, 552 [85 S.Ct. 1187, 1191, 14 L.Ed.2d 62] (1965).

The timing and content of notice and the opportunity to be heard which are required for due process depend upon an accommodation of the competing interests involved. *Goss v. Lopez,* 419 U.S. 565, 579, 95 S.Ct. 729, 738, 42 L.Ed.2d 725 (1975). If an emergency situation exists, the government may temporarily deprive a person of property pending a hearing at a later date. *Id.* at 582–83, 95 S.Ct. at 740. In this case, the government has never alleged that any emergency situation existed to justify ATL's suspension and immediate awards to others prior to a hearing. The record indicates that the contrary was true, given the four month delay between bid opening and the suspension. In fact, in his testimony, Captain Dallam explained that he was prompted to make the awards at that time merely by the fact that the most recent time extension for acceptance of such bids acquiesced in by the bidders would expire July 31, 1983 (2 weeks later). Even if an emergency situation had existed, which would have prevented giving ATL a full hearing prior to the suspension, a conference could have been held to discuss the integrity issue with OICC to provide a safeguard against arbitrary action. *See Arrow Transp. Co. v. Southern Railway,* 372 U.S. 658, 672 n. 23, 83 S.Ct. 984, 991 n. 23, 10 L.Ed.2d 52 (1963).

Furthermore, defendant cites no case in which it has been held that the government may temporarily deprive a person of a protected interest in an emergency situation and then not remedy the deprivation if the affected party prevails at the later hearing. Three of the contracts here at issue were awarded by the government to other bidders within an hour of ATL's suspension. Even if OICC is correct on the merits of the suspension, it is inconsistent with the due process clause for the office to have made the decision that misconduct or fraud had occurred without giving ATL a meaningful hearing at a meaningful time.

*See Goss,* 419 U.S. at 581 n. 9, 95 S.Ct. at 739 n. 9; *Armstrong v. Manzo,* 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62 (1965). A procedure which gives a contractor a hearing at a point in time when he has lost any possibility of being awarded the contracts on which he was the low bidder and technically responsible cannot conceivably be held to be meaningful process. "[P]rocess which is a mere gesture is not due process." *Mullane v. Central Hanover Trust Co.,* 339 U.S. 306, 315, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950).

The inadequacy of the post-suspension hearing to protect plaintiff's rights is made all the more clear by the record in this case, which shows that (1) the consideration of all four of plaintiff's low bids prior to the suspension was unreasonably attenuated for the purpose of avoiding the furnishing to plaintiff of the charges and evidence needed to support rejection of the bids for non-responsibility based on lack of integrity, and (2) that OICC requested plaintiff's suspension for the same purpose.

From the time the first two bids were opened on March 2, 1983, it was understood by OICC personnel that no action would be taken on them until at least mid-April when an indictment was expected and plaintiff could be suspended or debarred.

When no indictment was forthcoming by the end of April, and Mr. Masumoto informed Captain Dallam that on the basis of his pre-award survey he had no information which would preclude award of the first two contracts to plaintiff, a slowdown in the consideration of plaintiff's bids ensued. While there may not have been an express agreement or orders for the slowdown, plaintiff was required to explain every element of its proposed plans and method of operation and quality control on each contract. Piecemeal requests for additional information were addressed to plaintiff seriatim. When plaintiff responded promptly to one, a substantial time interval would elapse before the Navy would send it another. This occurred on May 2, June 17 and July 1.

Although in mid-May Mr. Masumoto determined that there were no outstanding questions as to ATL's experience and ability to perform the contracts under the two later solicitations, consideration of these two were also delayed so that ATL's qualifications to perform all four could be considered concurrently.

It was not until the last week in May that, for the first time, Captain Dallam asked for the formation of a pre-award survey team to study ATL's technical ability to perform all the contracts.

In his testimony Commander Messick conceded that ordinarily OICC relied upon Mr. Masumoto's certification as to a bidder's technical ability, but that the intensive investigation and delay in the consideration of ATL's technical qualifications was attributable at least in part to the desire to await the results of the NIS and FBI integrity investigations. In effect there was a *de facto* suspension without giving plaintiff any opportunity to confront the charges.

When, on June 16, Captain Dallam went to see the U.S. Attorney in Honolulu to inquire about the delayed indictment and as to what information he could use in support of a lack of integrity determination, and when shortly thereafter he told his counsel, Mr. Wayne, to prepare the documents in support of ATL's suspension, there could be no doubt that at the least Captain Dallam had arrived at a determination that plaintiff lacked integrity. And the same was obviously true when on June 23 he conferred with SBA representatives to ascertain whether he could reject plaintiff's bids for integrity reasons without disclosing the evidence to plaintiff. On each of those occasions Captain Dallam could have notified plaintiff that he proposed to reject its bids for integrity reasons, but he chose to wait for the formal suspension because thereby he could avoid having to give plaintiff the pertinent information, as the U.S. Attorney preferred.

Finally, Captain Dallam's own letter of July 1, 1983, to higher authority requesting the suspension confirms that an important purpose of the suspension, and not a mere

incident thereof, was its use as a device to prevent the contractor from obtaining the stigmatizing allegations to which it would otherwise be entitled upon rejection of its low bid for nonresponsibility for lack of integrity, and to prevent review of that determination by SBA, as the contractor would have the right to have. The letter explained:

These allegations have at the request of OICC MIDPAC, been under investigation by NIS, the FBI, and the Department of Justice for some time. It had been contemplated that this request would have included an indictment. It was determined on 16 June 1983, however, that the indictment would not be available at the time anticipated because the Department of Justice had decided to complete discovery on all of the allegations before moving for any indictment. Because the subject contractor is the low responsive bidder in response to the four IFB's listed on Enclosure (1) and because award on these contracts cannot be delayed until an indictment is secured, this request for suspension is being submitted without such indictment.

\* \* \* \* \* \*

This command has considered not awarding the contracts listed on Enclosure (1) to the subject contractor based on a nonresponsibility determination based on integrity and forwarding that package to the regional Small Business Administration (SBA) Office. However, after discussions with the SBA District Counsel and others within the SBA chain, it became apparent that some, if not all of the information contained in the enclosures (2) through (6) would be released to the subject contractor. Local NIS, FBI, U.S. Attorney's Office representatives have advised that to do so would severely compromise these ongoing criminal investigations.

Defendant contends that the court in *Horne Brothers* upheld the validity of predecessor regulations having similar provisions. However, the adequacy of a hearing is not a decision to be based upon the

validity of a general regulations but upon the facts of the case. *Mathews v. Eldridge,* 424 U.S. at 335, 96 S.Ct. at 903. " '[D]ue process', unlike some legal rule, is not a technical conception with a fixed content unrelated to time, place and circumstances." *Cafeteria Workers v. McElroy,* 367 U.S. 886, 895, 81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230 (1961). "[D]ue process is flexible and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972).

In *Horne Brothers,* at the time the contractor was suspended it had no right to any contract on which it was already low bidder. Its complaint was with reference to a subsequent bid disqualification. Here, of course, the contractor complains that it was deprived of a more concrete interest, four contracts on which it had submitted the low bids 3 to 4 months earlier and on which even prior to suspension it had the right to expect favorable treatment and not be deprived of them without adequately disclosed reasons and an opportunity to rebut or explain them.

■ What reasonably follows from this is that due process demands that plaintiff be provided a fair hearing before an officer who has not yet made up his mind and, despite the awards to others, plaintiff not be precluded from receiving the four awards in the event that it is exculpated of the charges which underlie the suspension.

There still remains for consideration plaintiff's concern that any hearing it will be afforded pursuant to the suspension regulations will be merely *pro forma* because the Navy has or will fail to furnish adequate information as to the allegations against it.

The regulations state that the suspension must be based "upon adequate evidence" of offenses indicative of a lack of business integrity or business honesty, and they provide for factfinding, which includes the submission of documents, presentation of witnesses, confrontation of witnesses presented by the department, and even a transcript. This would appear quite adequate were it not for the fact that they also provide that most of these rights may be substantially nullified or impaired upon the advice of a United States attorney that future contemplated legal proceedings, criminal or civil, will be prejudiced by disclosure of the government's evidence.[6] In this case the Navy notified plaintiff in its suspension letter that "no factfinding proceeding will be conducted as the result of a request from the United States Attorney in Hawaii."

The only reason for not confronting ATL with the evidence against it was the desire by the U.S. Attorney to keep the information confidential. The issue then is whether a U.S. Attorney may mandate the denial of a contractor's procedural due process rights,

---

**6.** DAR 1–606 contains the following provisions:

1–606.3 *Procedures.*

\* \* \* \* \* \*

(b) *Decisionmaking Process.*

\* \* \* \* \* \*

(2) *In actions not based on an indictment,* if it is found that the contractor's submission in opposition raises a genuine dispute over facts material to the suspension and if no determination has been made, on the basis of Department of Justice advice, that substantial interests of the Government in pending or contemplated legal proceedings based on the same facts as the suspension would be prejudiced, factfinding shall be conducted. The official conducting factfinding shall—

(i) afford the contractor an opportunity to appear with counsel, submit documentary evidence, present witnesses and confront any person the Department presents; and

(ii) ensure that a record of the factfinding is transcribed and made available at cost to the contractor upon request, unless the contractor and the Department, by mutual agreement, waive the requirement for a transcript.

(c) *Notice of Suspension.* When a contractor and any specifically named affiliates are suspended, they shall be immediately advised by certified mail, return receipt requested—

\* \* \* \* \* \*

(6) that factfindings to determine disputed material facts will be conducted unless (i) the action is based on an indictment or (ii) a determination is made, on the basis of Department of Justice advice, that the substantial interests of the Government in pending or contemplated legal proceedings based on the same facts as the suspension would be prejudiced.

which would otherwise be appropriate, solely to protect his criminal investigation.

Although such considerations were apparently accepted as valid by two circuit court decisions in evaluating the kind of hearing to which a contractor is entitled as a part of due process (*Horne Brothers Inc. v. Laird, supra*, and *Transco Security, Inc. of Ohio v. Freeman*, 639 F.2d 318, 324 (6th Cir.), *cert. denied* 454 U.S. 820, 102 S.Ct. 101, 70 L.Ed.2d 90 (1981)), in neither case was there any discussion of why it should be so and the extent to which it should balance or outweigh the contractor's need for disclosure of what it must meet.

In *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976), the Supreme Court stated that in determining the kind of hearing to which a person is entitled, due process generally requires balancing of three distinct factors:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probative value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirements would entail.

In the case at bar, the interest of ATL is substantial. It is a small business, wholly dependent on government work. The suspension imposed upon it by the government immediately deprived it of a right to receive four Navy contracts with a value of over $5.5 million, more than a year's average receipts. According to the testimony of its president, if the denial of these contracts and the suspension from other government business is sustained, ATL will have to layoff permanent employees, sell its construction equipment and close its business office.

■ The interest of ATL in the continued receipt of government contracts may be analogized to that of an individual who is denied a license to practice his chosen profession. *See generally* Friendly, *Some Kind Of Hearing*, 123 U.Pa.L.Rev. 1267, 1297–98

n. 156 (1975). An individual has the right to notice and opportunity to be heard before he is debarred, suspended, or denied a license to practice a profession by a government agency. *In re Ruffalo*, 390 U.S. 544, 88 S.Ct. 1222, 20 L.Ed.2d 117 (1968); *Wilner v. Committee on Character and Fitness*, 373 U.S. 96, 83 S.Ct. 1175, 10 L.Ed.2d 224 (1963); *Goldsmith v. Board of Tax Appeals*, 270 U.S. 117, 46 S.Ct. 215, 70 L.Ed. 494 (1926). Even where the governing body has discretion to debar or suspend, this discretion "must be construed to mean the exercise of a discretion to be exercised after fair investigation, with such a notice, hearing and opportunity to answer for the applicant as would constitute due process." *Goldsmith*, 270 U.S. at 123, 46 S.Ct. at 217.

■ The risk of erroneous deprivation of a protected interest through the procedures utilized by the Navy in this case is great. As noted previously, if the testimony of plaintiff's president and plaintiff's quality control representative at trial is believed, plaintiff may be wholly exculpated of the specific charges. For example, with respect to one of the most serious charges, that of fraudulently concealing the absence of wall insulation, plaintiff's representative testified that a subcontractor had omitted the insulation; that he and not the government inspector had discovered the fact; that he, himself, had reported it to the government inspector; and that he had it promptly repaired. Under the regulations (DAR 1–606.4) the "temporary" suspension may last up to 18 months without completion of the investigation, and if the *ex parte* allegations turn out to be untrue or explainable the contractor will not be reimbursed for the loss of his contracts and business. The possibility of error in any *ex parte* accusatory proceeding and the price that the contractor will have to pay therefor in any event indicate that procedural safeguards are necessary to protect the interests of threatened contractors.

With respect to the burden that would be imposed upon the Navy by a proper hearing with adequate notice and opportunity to

rebut prior to the rejection of plaintiff's bids on the four solicitations, the government has not argued that it would have been unduly burdensome for the Navy to have confronted ATL with the charges against it and given the company an opportunity to respond. This leaves largely the burden that the government would have of conducting a criminal prosecution in which the evidence is known to the accused. In this day and age, when mutual discovery has eliminated the pretrial secrecy of evidence in civil litigation without horrendous consequences, and its absence in favor of defendant in criminal cases has been criticized by many authorities,[7] it is difficult to conclude that the government's interest in keeping evidence secret, necessarily outweighs the more serious effect which such secrecy may have upon the contractor's right to know the charges against him when he is deprived of his livelihood. Of course, in specific instances the possibility of intimidation or coercion of witnesses or fabrication of opposing testimony, may be an important consideration, but, particularly where there has been no indictment and there may never be a criminal prosecution, it should not be assumed.

Assuming, however, that the government's desire to maintain the secrecy of its criminal investigation must be balanced against the importance of plaintiff's need to know sufficiently the charges or allegations against it, this does not necessarily mean that the government should not release whatever information it safely can without impairing the security of its witnesses. And if it does not release all of the information plaintiff wants but enough so that plaintiff may rebut or explain away the charges, the hearing may still be constitutionally adequate. As the court pointed out in *Horne Brothers, Inc.*, 463 F.2d at 1271, in balancing the conflicting interests "A question of judgment is involved." And, as the court stated in *Transco Security Inc. of Ohio*, 639 F.2d at 324—

[I]n this case the interest of appellants in more specific notice and, of the government in maintaining the integrity of its investigation, are not mutually exclusive. Advising appellants of which bills were irregular and how the caliber of its employees were misrepresented need not involve the disclosure of the government's evidence. The government need not at this point inform appellants of any information it has. It need not reveal, for example, the identity of potential witnesses or the existence of documents unknown to appellants. It can state the charges with more particularity without identifying the source of the government's information. * * *

* * * Without a clear understanding of at least some of the facts which comprised the grounds for suspension, the opportunity to present information is a meaningless one.

What the matter comes down to is that on the present state of the record it is not necessarily to be inferred that the Navy's Chief of Material will deny to plaintiff information which it needs to make a proper rebuttal or explanation of the charges against it. The charges are now set out in the Navy's suspension letter. Only one of them (that "certain nonconforming materials have been provided and paid for by the Government which the company knew did not conform to the Contract Specifications") is so vague as *prima facie* to be incompatible with due process. If plaintiff is denied information sufficient to enable it to meet the charges, it will be up to plaintiff to ask the Navy for additional details. It is not to be presumed that the Navy will deny a request reasonably necessary for

---

**7.** *See generally* Nakell, *Criminal Discovery for the Defense and the Prosecution,* 50 N.C.L.Rev. 437, 438–39 (1972):

In every way in which a trend in the development of a new legal procedure can manifest itself, it has done so in connection with discovery in favor of a criminal defendant. The literature overwhelmingly supports broad discovery. Supreme Court Justice Brennan, Retired Chief Justice Traynor of California, the American Bar Association, the American Law Institute, Professors Wigmore, Goldstein, Louisell, Pye, and Everett, and many others have forcefully argued in favor of defense discovery. (citations omitted.)

plaintiff to obtain a fair hearing. If the Navy does and plaintiff can show injury as a result of such action, there will be time enough thereafter for plaintiff to contend that it has been denied due process.

■ One other matter remains for consideration. Title 15 U.S.C. § 637(b)(7)(A) (1982) provides that a government procurement officer may not preclude a small business concern from being awarded a government contract for reasons of responsibility including integrity, without referring the matter for a final disposition to the SBA. On the other hand, 32 C.F.R. § 1–705.4(4)(6) (1982), provides that "[a] referral need not be made to the SBA if a small business concern has been suspended or debarred pursuant to * * * DAR 1–600." Plaintiff contends that if as a result of the suspension hearing its bids remain rejected for lack of integrity it is entitled to SBA redetermination of that decision. Defendant maintains that pursuant to 32 C.F.R. § 1–705(4)(6) (1982), no referral need be made to the SBA.

It has been decided herein that the suspension was used impermissibly as a device to preclude disclosing to plaintiff and to the SBA the factual basis for the Navy's determination that plaintiff lacks integrity and plaintiff still remains entitled to a pre-rejection hearing. For the same reason it remains entitled to SBA review. This is not a decision that 32 C.F.R. § 1–705.4(c)(6) (1982), is invalid, but merely that it is inapplicable to the facts of the present case wherein SBA review is mandated by statute.

### Conclusion

As a result of the Navy's action in awarding to other bidders three of four contracts on which plaintiff has been low bidder and its threat to award the fourth to another prior to the time when plaintiff has been given an opportunity for a fair hearing on disqualifying charges of lack of integrity plaintiff may sustain irreparable injury. In the event that after a fair hearing plaintiff is exculpated from such charges, damages will be an inadequate remedy. It is in the public interest that bidders on Navy contracts be assured that the Department will not disqualify them on charges of fraud or lack of integrity without due process of law and without complying with pertinent statutes intended for protection of small business contractors.

Wherefore, IT IS ORDERED that:

1. For the period ending in paragraph 2 hereof defendant, by and through the Department of the Navy, and its officers, agents, and employees are enjoined and restrained from awarding the following solicitations to any entity other than plaintiff:

   (a) IFB No. N62471–81–B–1458 (Electrical Power Improvements);
   (b) IFB No. N62471–81–B–1481 (Repair of Supply Wharf K–9);
   (c) IFB No. N62471–81–B–1528 (Demolition of Third Floor and Roofing of Second Floor, Building 474);
   (d) IFB No. N62471–80–B–1452 (Modernization of Hale Moku Housing);

However, in the event that any of the above-referenced solicitations have been awarded to an entity prior to the issuance of this order or the communication of this order to the proper contracting officials, defendant, by and through the Department of the Navy, and its officers, agents, and employees are enjoined and restrained from directing or permitting performance of any work under any contract awarded pursuant to any of the four above-referenced solicitations.

2. This injunction will automatically expire 5 business days after receipt by plaintiff or its attorney, whichever is sooner, of notice of the decision of the Chief of Naval Material on the rejection of plaintiff's bids on the aforementioned solicitations and plaintiff's suspension, except that if the decision is adverse to plaintiff and plaintiff files a timely request for review to the SBA pursuant to 15 U.S.C. 637(b)(7)(A) (1982), it shall expire 5 days after the decision of the SBA.

3. Counsel for defendant shall communicate as soon as reasonably possible the contents of this order to the proper Navy con-

tracting officials of the above-referenced solicitations and shall forward to them a copy of this opinion.

4. All present requests for relief by plaintiff other than for damages are denied.

5. Defendant shall respond to plaintiff's amended complaint filed August 1, 1983, insofar as it requests damages, within the time required by the rules of this court.