PLANNING RESEARCH
CORPORATION,
Plaintiff,

v.

The UNITED STATES, Defendant,

and

Calculon Corporation, Intervenor.

No. 605–83C.

United States Claims Court.

Dec. 30, 1983.

John T. Boese, Washington, D.C., for plaintiff; Kenneth S. Kramer and Richard H. Wyron, Washington, D.C., of counsel.

Thomas W.B. Porter, with whom is Acting Asst. Atty. Gen. Richard K. Willard, Washington, D.C., for defendant; Margaret E. McCloskey, Washington, D.C., of counsel.

David V. Anthony, Washington, D.C., for intervenor; Irving Jaffe and James D. Warren, Washington, D.C., of counsel.

ON CROSS MOTIONS FOR
SUMMARY JUDGMENT.

OPINION

SETO, Judge:

This pre-award contract case was instituted on October 5, 1983, by the filing of a Complaint by plaintiff, Planning Research Corporation ("PRC"), which requested "temporary, preliminary, and permanent" injunctive relief and a declaratory judgment. Plaintiff alleges that its bid for a Department of Energy ("DOE") services contract was unfairly evaluated and that the delegation of authority to the Source Selection Official for the proposed contract was illegal.

Plaintiff requested, and was granted, leave to file a Motion for Summary Judgment. The sole issue raised by the Motion concerned plaintiff's contention that the Source Selection Official for the procurement did not have the necessary legal authority to make the contract award selection. Defendant and intervenor filed Cross-Motions for Summary Judgment on that issue and on the additional issues raised in plaintiff's Complaint.

For the reasons set forth below, the court has determined that plaintiff's Motion for Summary Judgment should be denied; that defendant's and intervenor's Cross-Motions for Summary Judgment should be granted; and that the Complaint should be dismissed.

### FACTS

The following outline of facts and events occurring prior to plaintiff's filing of its Complaint is drawn from the Complaint, plaintiff's Motion for Summary Judgment, and defendant's Cross-Motion for Summary Judgment.[1]

Plaintiff PRC is a Delaware corporation with its principal place of business in McLean, Virginia. Part of its business includes supplying automated data processing ("ADP") and telecommunications services to the United States Government.

On April 6, 1983, DOE published notice that it was seeking proposals for support services to its Office of Computer Services and Telecommunications Management ("CSTM"), which services were to include: operating, maintaining, and improving the ADP and telecommunication services then utilized by DOE. The contract was to have a base term of two years with three one-year options; would require about 3.2 mil-lion professional work-hours; and would have an estimate worth of approximately $70 million.

DOE sent copies of its Request for Proposals ("RFP") No. DE–RP01–83MA32400 to three hundred and seven firms, twenty-four of which made an initial response. Only four firms, however, actually submitted proposals; all four proposals were received on or before the June 20 deadline. The four firms submitting proposals were:

(a) Calculon Corporation ("Calculon"), the incumbent contractor at DOE and the intervenor herein;

(b) PRC;

(c) Electronic Data Systems-Federal ("EDS"); and

(d) Holmes and Narver, Incorporated.

DOE made initial evaluations of the proposals and determined that neither EDS nor Holmes and Narver came, nor could come,[2] within the competitive range. These two proposals were therefore rejected. The proposals of both Calculon and PRC, however, were found to be in the competitive range, and the two companies were so informed.

During the initial evaluations, DOE discovered that two of the four proposals, one of which was PRC's, included proposed subcontracts with firms having substantial sales in telecommunications hardware. DOE planned to make large investments in such hardware and expected the contractor to evaluate such hardware for possible purchase. In light of the statutory and regulatory prohibitions against making awards which might create organizational conflicts of interest[3], DOE therefore amended the Organizational Conflict of Interest Clause in the solicitation.[4] As amended, the clause

---

1. Intervenor's Cross-Motion for Summary Judgment contained no statement of facts; intervenor instead relied on defendant's brief and appendix. The facts as used in this opinion are assumed solely for the purposes of resolving the summary judgment motions herein.

2. In the context of the time restraints inherent in the contract terms itself, DOE believed that neither EDS nor Holmes and Narver could bring their bid within the competitive range.

3. See, e.g., 15 U.S.C. § 789; 42 U.S.C. § 5918; 41 C.F.R. §§ 9–1.5401 et seq.

4. The relevant subparagraph originally read: (b)(1)(iii) Nothing in this paragraph shall preclude the Contractor [defined throughout as including "a prime contractor, subcontractor, co-sponsor, joint venturer, consultant, or [one] in any similar capacity"] from offering or selling its standard commercial items to the Government. [Solicitation Part III, Sec-

prohibited any contractor or subcontractor from being, or proposing to be, a contractor or subcontractor on any DOE procurement "for hardware or software, or systems of hardware or software or both, which relate to telecommunications, data processing services, or teleprocessing services" during the time of the instant contract, and for two years thereafter.

The amendment was contained in letters sent to both PRC and Calculon on July 15. The letters stated that the two companies were to acknowledge the new clause or were to state what exceptions (and rationales therefor) were requested. There is nothing in the record to show that either PRC or Calculon requested any exceptions to the new clause.

As a result of the new conflict of interest clause, PRC's proposed subcontractor[5] withdrew; PRC replaced its subcontractor with in-house personnel and other subcontractors.

The July 15 letters also contained questions for the respective bidders which were to be answered in writing. Thereafter, on August 3 and 4, Calculon and PRC, respectively, met with DOE personnel and orally discussed their submissions. During the August 4 discussion with DOE, PRC informed DOE that its subcontractor had withdrawn due to the amendment in the conflict of interest clause. In consideration thereof, although absent specific request by PRC, DOE extended its deadline for the submission of "Best and Final Offers" to

August 22. Both companies met this deadline.

The two proposals were evaluated by the Source Evaluation Board ("SEB") formed by DOE personnel for this procurement. The SEB was to function in the following manner: after individual Board members had investigated the proposals, they were to assign numerical ratings to each factor cited as important in the solicitation. The Board was then to determine a final consensus as to the rating of each factor. The rating was then multiplied by numbers reflecting the relative weights of each factor, and a final score was determined.[6] This score was included in a report on the proposals prepared by the SEB for use by the Source Selection Official. In this case, the SEB report contained sixty-nine pages of discussion and thirty-seven charts outlining the proposals and the Board's evaluations. The Source Selection Official was then to select a bidder for award of the contract based on the SEB report and his review thereof.

On October 3, PRC was informed that a "Selection Statement" had been signed by the designated Source Selection Official, Mr. William S. Heffelfinger, and that the Statement's conclusion was to the effect that Calculon should be awarded the contract. Mr. Heffelfinger's reasoning was set forth as follows:

The Source Evaluation Board rated the CALCULON technical proposal as better than the PRC technical proposal. It evaluated the cost proposals as essentially

---

tion L, Standard General Provision 410.72.b [sic], pages 120–121.]

5. PRC's proposed subcontractor was Federal Electric Corporation, a subsidiary of International Telephone and Telegraph.

6. The solicitation stated that the three general criteria were: technical, cost, and business/management. The technical criterion had "substantially greater importance" than cost (although DOE reserved the right to base its decision on cost should two or more proposals be technically equal) and the business/management criterion had "significantly less" weight than either the cost or technical criteria. The technical criterion was further broken down into the four following criteria:

1. Offeror's corporate experience and understanding of the Statement of Work.
2. Offeror's ability to staff the thirty (30) resumed core positions with fully trained and experienced people.
3. Offeror's ability to staff the five (5) key personnel positions with fully trained and experienced people.
4. Offeror's plan for project management, both for corporate commitment and management approach, and the systems for work definition, planning, staffing, and reporting. [Selection Statement for ADP and Telecommunications Support Services, p. 3, October 3, 1983].

equal and both business/management proposals as "satisfactory." Based upon a careful review of the Board's findings and the application of the solicitation-prescribed criteria to the findings, I [Mr. Heffelfinger] confirm the Board's relative rankings.

It is clear that both firms submitted sound technical proposals.... However, only CALCULON's proposal established that it possessed the full range of directly related corporate experience sought in both the ADP and the telecommunications areas. CALCULON's proposal documented far greater relevant corporate experience in the areas of telecommunications, communications security (COMSEC and TEMPEST), and communications software of the type required for SACNET. PRC's proposal reflected only limited corporate experience in the vitally important areas of digital/voice PBX communications, radio frequency, and communications satellite engineering. It did not cite any corporate experience with COMSEC or TEMPEST for itself or its subcontractors, although its subcontractor, CRC, demonstrated a thorough understanding of these programs. Further, PRC and its subcontractor demonstrated only limited corporate experience with communications software of the type required for SACNET. These differences in corporate experience are in areas critical to the Department's mission.

Accordingly, I have concluded that the CALCULON technical proposal is considerably better than the PRC technical proposal.

Upon learning of this statement, and before any award was actually made pursuant thereto, PRC instituted this action.

## PROCEDURAL HISTORY

PRC's Complaint alleges essentially four bases for enjoining the proposed award and declaring the selection void. First, PRC alleges that Mr. Heffelfinger did not have the authority to make the selection because 41 C.F.R. § 9–3.805–50(a) [7] appears to grant

---

7. The text of this regulation is as follows:

§ 9–3.805–50 Selection procedures.

(a)(1) The following officials are designated as Source Selection Officials for all source selection decisions involving awards of contracts when the value of the selection deci-sions, which shall include the sum of all awards, all phases or options, and all cost shares regardless of derivation, will cumulatively total in excess of or up to and including the following amounts

| Source Selection Official | Contracts in excess of or up to and including the following amounts |
|---|---|
| (i) Secretary, Deputy Secretary, or Under Secretary. | In excess of $50 million |
| (ii) Cognizant Assistant Secretary, Administrators, Director of Office of Energy Research, Director of Procurement and Assistance Management, Director of Administration or Controller. Note: This authority may be delegated on a case-by-case basis only when approved by the Under Secretary. | In excess of $10 million up to $50 million |
| (iii) Cognizant Office Directors. Note: This may be delegated on a case-by-case basis to a field office manager with the concurrence of the Senior Procurement Official, Headquarters. | In excess of $5 million up to $10 million |
| (iv) The Source Selection Official shall be the HPA, an official designated by the HPA or the Contracting Officer. | Up to $5 million |

(2) Exceptions

The Secretary, Deputy Secretary, or Under Secretary may retain source selection author-ity on any specifically designated selection action expected to result in contracts, regardless of dollar value. The cognizant Assistant

only the Secretary, the Deputy Secretary, and the Under Secretary of DOE the authority to award contracts worth over fifty million dollars. PRC's second contention is that DOE somehow favored Calculon because of the latter's incumbency, and precluded "meaningful competition" in violation of 41 C.F.R. §§ 1–3.101(d) and 9–3.805–51(d). Plaintiff's third contention is that the amendment of the Organizational Conflict of Interest Clause was "calculated to ensure award to the incumbent contractor, Calculon" by effectively eliminating PRC's initially proposed subcontractor. Finally, PRC alleges that detractions for deficiencies in PRC's proposal were disproportionately greater than detractions for similar deficiencies in Calculon's proposal.

Along with its Complaint, PRC filed a Motion for the Immediate Filing of the Administrative Record Or, in the Alternative, for Early Discovery. This motion was vigorously opposed by defendant, on the grounds of the confidentiality required for bid proposal material[8], and by Calculon (which had moved for, and been granted, leave to intervene as a party-defendant).

Before a ruling was made on PRC's motion, PRC, by leave of the court, filed a Motion for Summary Judgment on October 25. The motion requested that the court issue a ruling permanently enjoining DOE from awarding the contract to Calculon and remanding the matter to DOE for consideration. Pursuant to an expedited briefing schedule, defendant and intervenor each responded by filing Cross-Motions for Summary Judgment.

PRC's motion was based solely on the issue of the legality *vel non* of the delega-

tion of selection authority to Mr. Heffelfinger. Both responses, on the other hand, cross-moved as to all issues. In reply, and at oral arguments heard on these motions, counsel for PRC maintained that no substantive response to the cross-motions was possible without access to the Administrative Record. At the close of argument, therefore, the court ordered each party to submit a proposed protective order and to thereafter critique each other party's proposal.

After considering the arguments and submissions, the court issued an Order and a Protective Order on November 18. Pursuant to these orders, the defendant was to file the Record under seal with the Clerk of the Court after having (1) excised all four proposals and the two "Best and Final Offers" and any material relating to the two bids deemed non-competitive,[9] and (2) encoded the names of the members of the SEB. Access to the Record was limited to counsel for defendant and "outside" counsel for PRC and Calculon.[10]

In the two weeks following the filing of the November 18 Orders the court received several motions. On November 23, PRC moved to dismiss the counterclaim contained in Calculon's Answer. On November 29, both PRC and Calculon filed motions for reconsideration of the Protective Order and, during oral arguments on the motions for reconsideration, defendant orally moved for a ruling barring PRC from deposing any DOE personnel.[11] These motions were argued and briefed and, on December 1, the court issued an Order Modifying the Protective Order and Limiting Discovery, ruling

---

Secretaries, Administrators, Director of Energy Research, Director of Procurement and Assistance Management, Director of Administration, or Controller may retain source selection authority on specifically delegated contracts, under $10,000,000.

(3) The retention of authority described above shall be signed by the appropriate retaining official and placed in the official contract file.

**8.** *See* 41 C.F.R. § 9–3.150–2.

**9.** *I.e.,* the bids submitted by EDS and Holmes and Narver.

**10.** Defendant and intervenor both argued vigorously that plaintiff, PRC, should not be given any access to the administrative record whatsoever, since it had not as yet asserted any substantial allegations of bad faith, illegality, or arbitrariness or capriciousness on the part of the contracting officer or members of SEB.

**11.** Third-party-defendant intervenor also strongly supported defendant at the oral argument on this point.

that plaintiff had not demonstrated a justified need to depose any of the DOE personnel.[12]

On December 6, PRC filed a Motion to Reconsider and Amend in Part the Order of December 1. Plaintiff urged that it be allowed to depose only one person at DOE—the contracting officer Mr. Robert J. Woytko. The court convened a telephonic conference for the purpose of hearing presentations regarding this motion at 4:00 p.m. that afternoon.

Counsel for PRC stated that its questions at deposition would be limited to factual inquiries concerning: (1) why the SEB did not follow the SEB Handbook in regard to signing and dating the SEB report; (2) whether or not, at a time prior to October 3, an award to PRC had been contemplated; and (3) why the Record contained no minutes for SEB meetings scheduled after September 3.

Counsel for defendant responded during the telephone conference that he had made further inquiries of the DOE office in Rockville, Maryland, and had been informed that a signed and dated "final" copy of the SEB report did exist and was being forwarded to him. He stated that the copy of the report in the Record was apparently a preliminary draft of the report, but that the only differences between the preliminary and final drafts were proofreading and editorial corrections. Counsel also stated that the reason no minutes existed for SEB meetings scheduled after September 3 was that there had been no further meetings of the SEB. Counsel concluded by stating: (1) the foregoing information effectively answered points "(1)" and "(3)" of PRC's request; (2) any other information, including an answer to point "(2)," would be irrelevant; and (3) discovery in this case was properly limited to the Record. Defendant and intervenor remained strongly opposed to the taking of any depositions whatsoever without a substantial assertion of bad faith, illegality or arbitrary or capricious acts.

Counsel for PRC responded by stating that, defendant's new information notwithstanding, there remained unexplained gaps in the Record due to the absence of evaluation sheets from several SEB members, and there existed discrepancies between the rating given PRC by at least one SEB member on the individual rating sheet and that rating as recorded in the SEB minutes.

After considering the oral presentations and the briefs filed regarding PRC's December 6 motion, the court issued an Order on December 7 granting PRC leave to depose Mr. Woytko, but limiting the scope of inquiry to matters strictly of fact, and excluding any inquiry into mental processes.

Plaintiff, PRC, deposed Mr. Woytko for five hours on December 8 regarding, *inter alia*, SEB procedures. On December 9, pursuant to part of the November 18 Order, the parties filed pre-hearing memoranda and witness and exhibit lists. In its memorandum, PRC stated that it had learned from Mr. Woytko that many alleged "working papers" of the SEB had been destroyed, papers which PRC alleged were essential to formulating its opposition to the cross-motions. Therefore, PRC decided against attempting to adduce further evidence and requested that the court decide the motions on the basis of the record.

On December 12, PRC was allowed to file a Supplemental Memorandum in Support of its Motion for Summary Judgment. Further oral arguments on the motions were held on December 13. During argument, defendant filed with the court several affidavits from SEB members and DOE personnel. Pursuant to the court's ruling, defendant and intervenor filed responses to PRC's supplemental memorandum on December 14.

There having been no further filings or motions made, this court considers the record closed for the purposes of ruling on the Motion and Cross-Motions for Summary Judgment, and bases its decision on the Administrative Record, the various and nu-

12. That Order is attached hereto.

merous affidavits, the oral arguments, and the filings of the parties.

## DISCUSSION

Throughout the pendency of this action, the court has been acutely aware of the conflict, often inhering in cases of this sort, between two general interests: (1) that of the plaintiff in having a full opportunity to vindicate its claim; and (2) that of the public "in the smooth flow and expeditious completion of the procurement process. . . ." [13]

On one hand, plaintiff, in bringing this action pursuant to 28 U.S.C. § 1491(a)(3), is acting as a "private attorney general" protecting "[t]he public interest in preventing the granting of [Government] contracts through arbitrary or capricious action. . . ." [14] To completely or substantially deny plaintiff the opportunity to fully present its case would, in effect, bar the door to this court that Congress opened in § 1491(a)(3).

Against this interest, however, must be weighed the consideration that "[i]t would be intolerable for any frustrated bidder 'to render uncertain for a prolonged period of time government contracts which are vital to the functions performed by the sovereign.' " [15] With this latter consideration in mind, the court, without objection from the parties, established expedited schedules for all briefings and for hearings.

Although at the outset of this case counsel for defendant represented to the court that DOE would voluntarily withhold award of the contract pending the court's decision (thus obviating any need for temporary or preliminary injunctive action), counsel's response some ten weeks later was different: "[W]e are now getting very close to the end of the pending [current] contract. So timing is becoming a crucial issue for the United States." [16]

The court granted with some alacrity, therefore, plaintiff's motion for leave to file a summary judgment motion before the expiration of the sixty-day period normally mandated by RUSCC 56(a). As noted above, defendant (and intervenor, but see note 1, *supra*) exercised its right pursuant to RUSCC 56(b), and cross-moved.

### A. Plaintiff's Motion for Summary Judgment

PRC's Motion for Summary Judgment was directed to the single issue of whether or not the Source Selection Official for this procurement had the requisite legal authority to make a valid selection decision. PRC does not dispute the fact that authority had been delegated to the official, but rather argues that the delegation was void as contrary to a DOE Procurement Regulation and that therefore the delegated decision was void. Defendant's opposition to this argument is based upon a statute generally authorizing the Secretary of DOE to delegate his authority.

### 1. Jurisdiction

The threshold issue in considering plaintiff's contention is whether or not this court has jurisdiction over a claim based on an alleged violation of a regulation in the procurement process. It is far from clear that a consensus regarding this jurisdiction has been reached by the Claims Court. The Court of Appeals for the Federal Circuit (CAFC), however, has recently addressed the issue of a party's standing to bring suit under § 1491(a)(3). *CACI, Inc.—Federal v. United States*, 719 F.2d 1567 (Fed.Cir.1983). The CAFC's opinion is instructive, and its decision is binding on this court.

---

13. *M. Steinthal & Co. v. Seamans*, 455 F.2d 1289, 1302 (D.C.Cir.1971) (footnote omitted).

14. *Scanwell Laboratories, Inc. v. Shaffer*, 424 F.2d 859, 864 (D.C.Cir.1970).

15. *M. Steinthal & Co. v. Seamans*, 455 F.2d 1289, 1303 (D.C.Cir.1971), *citing Blackhawk*

*Heating and Plumbing Co. v. Driver*, 433 F.2d 1137, 1141 (D.C.Cir.1970). *See also United States v. John C. Grimberg Co., Inc.*, 702 F.2d 1362, 1371 (Fed.Cir.1983).

16. Transcript at 296.

In contending that this court is without jurisdiction to afford relief for the violation of a procurement regulation, defendant cites *Quality Furniture Rentals, Inc. v. United States*, 1 Cl.Ct. 136 (1983) [KOZINSKI, C.J.]; *Ingersoll-Rand Co. v. United States*, 2 Cl.Ct. 373 (1983) [KOZINSKI, C.J.]; and *Cecile Industries, Inc. v. United States*, 2 Cl.Ct. 690 (1983) [WIESE, J.]. These cases have all held, albeit in differing circumstances, that the Claims Court has no jurisdiction over a § 1491(a)(3) action based on a violation of a statute or procurement regulation.

In contrast to the above holdings, several decisions have been announced implicitly or expressly holding that this court does have jurisdiction when a violation of a statute or regulation is involved. A very clear and direct assertion of jurisdiction over claims involving violations of applicable statutes and regulations is contained in *Heli-Jet Corp. v. United States*, 2 Cl.Ct. 613 (1983) [YANNELLO, J.], wherein it is stated:

> Such relief as is sought here should be granted only in infrequent and limited circumstances where such relief is clearly appropriate. These strictures have been the subject of comprehensive, and well-reasoned, opinions by other judges of the court, with which this court agrees. *See, e.g.,* the opinions of Judge Lydon in *Baird Corporation v. United States*, 1 Cl.Ct. 662 (Cl.Ct.1983) and of Judge Nettesheim in *Harris Data Communications Inc. v. United States*, 2 Cl.Ct. 229 (Cl.Ct.1983). It is not necessary to restate here the detailed discussions of those opinions.

> It is sufficient here to note that plaintiff, if it is to ultimately prevail on the merits, must sustain its burden of establishing:

> (1) that the procurement procedure involved a clear and prejudicial VIOLATION OF APPLICABLE STATUTES or regulations; OR

> (2) that there was NO RATIONAL BASIS for the agency's decision in a matter committed primarily to the contracting officer's discretion.

> *See Kentron Hawaii v. Warner*, 480 F.2d 1166 (D.C.Cir.1973) [2 Cl.Ct. at 615–616] [Emphasis in original].

Accord, *Essex Electro Engineers, Inc. v. United States*, 3 Cl.Ct. 277, 281 n. 3 (1983) [NETTESHEIM, J.]; *Electro-Methods, Inc. v. United States*, 3 Cl.Ct. 500, 507 (1983) [HARKINS, J.]; *AABCO, Inc. v. United States*, 3 Cl.Ct. 109, 113 (1983) [YOCK, J.]. *See also ATL, Inc. v. United States*, 3 Cl.Ct. 259 (1983) [MILLER, J.], where the court held that the exercise of jurisdiction in a § 1491(a)(3) case was proper where a violation of due process was alleged: "Thus it may fairly be inferred that Congress intended that in deciding whether or not to grant equitable relief the court consider and determine ... [w]hether or not there has been a failure to respect the rule of law." 3 Cl.Ct. at 267.

The apparent disagreement between the two lines of cases cited above has perhaps been resolved by the decision of the Court of Appeals for the Federal Circuit (CAFC) in *CACI, Inc.—Federal, supra.* In that case, the plaintiff alleged that the Department of Justice had violated certain ethical statutes in awarding a contract to another bidder. The CAFC defined the Claims Court's jurisdiction in § 1491(a)(3) actions by a two-step analysis. The first step is that "[t]he legislative history of [§ 1491(a)(3)] shows that Congress intended the Claims Court to have the same authority over suits by unsuccessful bidders ... that the district courts had under *Scanwell* [*Laboratories, Inc. v. Shaffer*, 424 F.2d 859 (D.C.Cir.1970)] [*supra*]." at 1573. The second step consists of the statement that "[t]he essence of 'the Scanwell doctrine, '... is that an unsuccessful bidder has standing to challenge a proposed contract award on the ground that in awarding the contract the government violated statutory and procedural requirements." at 1573–1574. The court therefore concludes that "[t]o deny ... standing to litigate this question before the Claims Court would vitiate the jurisdiction Congress gave that court over such suits in the Federal Courts Improvements Act." at 1574.

■ Based on this decision, therefore, this court holds that the exercise of *jurisdiction* in the case at bar is proper. Whether or not the alleged violation took place, and whether or not the violation, once proved, so tainted the procurement process as to deprive plaintiff of a fair and honest consideration of its bid are necessarily questions going to the merits of plaintiff's allegations. To hold that this court has no jurisdiction, thus not allowing a plaintiff even the opportunity to make the required showing, would mean that those who " 'are the people who will really have the incentive to bring suit' to compel 'agencies [to] follow the regulations which control government contracting' " [17] would be estopped to bring suit.

■ Such a holding does not mean that any frustrated bidder on a Government contract, by alleging a violation of a regulation, will be able to bring the procurement process to a complete halt. A party alleging such a violation will be quickly put to its proof in the face of the high public interest in the speed and efficiency of Government procurements. The rules and procedures of this court provide mechanisms allowing expedited treatment of cases brought under § 1491(a)(3), and provide sanctions against those who would attempt to abuse the court's processes. RUSCC 11, 65. There is no more reason to expect dilatory tactics in these cases than in any other type of case, and no reason to doubt swift retribution for such tactics.

## 2. The Merits

The violation alleged by PRC in this case concerns DOE Procurement Regulation (DOE–PR) 41 C.F.R. § 9–3.805–50(a), set out in full in note 6, *supra*. According to subpart (a)(1)(i) of that regulation, the Source Selection Official for any procurement for a contract having a value over $50 million is DOE's Secretary, Deputy Secretary, or Under Secretary. PRC contends that since the Source Selection Official who made the selection was not one of the named officials, the selection is void as being illegal.[18]

Plaintiff first contends that the naming of three specific officials as being the Source Selection Officials calls for a strict application of the maxim *expressio unius personae est exclusio alterius.* PRC buttresses this argument by pointing to the fact that subparts (a)(1)(ii) and (a)(1)(iii) both contain specific notes allowing the officials named in those subparts to delegate their authority on a case-by-case basis. The argument therefore follows that, subpart (a)(1)(i) containing no such permission to delegate, there can be no valid delegation of selection authority for contracts exceeding the stated dollar value.

Plaintiff further argues that DOE is bound by its own regulations. *See Morton v. Ruiz,* 415 U.S. 199, 94 S.Ct. 1055, 39 L.Ed.2d 270 (1974); *Service v. Dulles,* 354 U.S. 363, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1957); *Whelan v. United States,* 529 F.2d 1000, 208 Ct.Cl. 688 (1976). Therefore, PRC argues, DOE must either abide by its own regulations, or change them in a valid procedure. That procedure, mandated by 42 U.S.C. § 7191(a)(1), is that established by the Administrative Procedures Act ("APA"), codified at 5 U.S.C. § 551 *et seq.*[19] Plaintiff finally contends that DOE, having issued no contrary regulation or amendment to § 9–3.805–50(a)(1)(i) in the manner prescribed by the APA, should adopt plaintiff's interpretation of the regulation and hold that source selection authority for the relevant contracts should have been exercised by one of the three designated officials.

---

**17.** *CACI, Inc.—Federal,* 719 F.2d at 1572–1573, citing *Scanwell,* 424 F.2d at 864.

**18.** There is no dispute that the proposed contract has a value of approximately $70 million, nor that the Source Selection Official for the procurement *did not* hold one of the positions named in the subpart.

**19.** It should be noted that although the APA contains a general exception for "public property, loans, grants or contracts," 5 U.S.C. 553(a)(2), this exception is not available to DOE because of 42 U.S.C. § 7191(b)(3).

Defendant's primary counter-argument is that plaintiff's construction-by-implication of § 9–3.805–50 is improper and unpersuasive. Defendant bases its contention on the plain language of 42 U.S.C. § 7252. That section of the DOE Organization Act reads as follows:

Except as otherwise expressly prohibited by law, and except as otherwise provided in this chapter, the Secretary [of DOE] may delegate any of his functions to such officers and employees of the Department as he may designate, and may authorize such successive delegations of such functions within the Department as he may deem to be necessary or appropriate. (Emphasis supplied).

Defendant contends that DOE complied with the statute. There is no dispute that there exists a chain of delegation of authority to the one who acted as Source Selection Official for this procurement.[20] The dispute instead centers around the effect of the regulation on the delegation and redelegation of authority.

Defendant argues that this chain of delegation is valid, and is effective to have vested the proper authority in the Source Selection Official here. The language of the statute is clear in stating that "Except as otherwise *expressly* prohibited by law," the Secretary has the authority to delegate. [Emphasis added.] Defendant asserts that, however valid plaintiff's characterization of the regulation might be, a characterization based on implication cannot stand where a statutory exception is required to be "express".

Defendant's second argument is that the APA contains two exceptions under which the delegation is valid even if not published.[21] Defendant first points to 5 U.S.C. § 553, in subpart (A) following (b)(3). That provision states that "[e]xcept when notice or hearing is required by statute, this subsection [relating to the notice provisions of agency rule making] does not apply . . . to interpretative rules, general statements of policy, or *rules of agency organization, procedure, or practice. . . .*" [Emphasis added.] Defendant contends that an agency's determination of who holds what authority falls within this exception, and that the delegation was therefore effective, notwithstanding the fact that the delegation order and memorandum were not published. Defendant contends further that even were publication required, the delegation is still not invalid. As a basis for this proposition, defendant points to the second sentence of 5 U.S.C. § 552(a)(1): "Except to the extent that a person has actual and timely notice of the terms thereof, a person may not in any manner be required to resort to, or be adversely affected by, a matter required to be published in the Federal Register and not so published."

Defendant avers that PRC has shown no "adverse" effect resulting from the fact that the selection official was not the Secretary, Deputy Secretary, or Under Secretary of DOE, and that the delegation was only a rule of "organization, procedure, or practice" within DOE. As such, DOE was *not* required to publish the delegation documents, or, if publication was required, the fact that the orders were not published is only pertinent after plaintiff has demonstrated that it suffered some harm as a result of the delegation, which defendant claims plaintiff has not done.

■ This court, however, need not reach the complex issues regarding determinations of the kind of rule involved in the delegation, or what the effect might be of the delegation documents being published

---

**20.** On June 14, 1982, the then-Secretary of DOE signed Delegation Order No. 0204–98, which contained a broad delegation of authority to the Assistant Secretary, Management and Administration. The order also conveyed authority to redelegate the delegated authority. By a memorandum dated February 18, 1983, the Assistant Secretary, Management and Administration, delegated to the Director of Administra-

tion the specific authority to act as the selection official for the procurement at issue here.

Plaintiff does not dispute this sequence of events, but rather argues that the delegation and redelegation were ineffective in light of the regulation in issue.

**21.** Assuming *arguendo* that plaintiff's reading of the regulation is valid despite the statute.

*vel non.* Those issues become pertinent only if it is first decided that the regulation in question is in conflict with the delegation statute cited above. This court does not agree that a conflict exists.

Plaintiff's argument of prohibition by implication cannot, however elegantly or persuasively presented, overcome the plain meaning of § 7252. No abstract web of logic nor repeated reference to how courts have construed other statutes will create an *express* prohibition when the words themselves are missing. Plaintiff searches for those words in vain, and, having found them nowhere, requests this court to insert them into the regulation. Plaintiff's arguments are unpersuasive. It is clear from the legislative history of § 7252 that Congress intended the Secretary to have an authority "to delegate any of the functions vested in him to such officers and employees of the Department as he may designate.... It is the intent of the committee to provide the Secretary ... the authority to delegate any of his functions within the Department." *S.Rep.* No. 95–164, 95th Cong., 1st Sess. 50 (1977), *reprinted in* 1977 U.S.Code Cong. & Admin.News 854, 904. Section 9–3.805–50 "vests" in the Secretary the "function" of being the source selection official for contracts worth over $50 million—it in no way restricts his authority to delegate that function.

Moreover, the court finds two additional factors which are also persuasive. The Supreme Court has stated that "the administrative construction of [a] regulation ... [is] of controlling weight unless it is plainly erroneous or inconsistent with the regulation." *Udall v. Tallman,* 380 U.S. 1, 16–17, 85 S.Ct. 792, 801–802, 13 L.Ed.2d 616 (1965), *citing Bowles v. Seminole Rock Co.,* 325 U.S. 410, 413–414, 65 S.Ct. 1215, 1217–1218, 89 L.Ed. 1700 (1945). *See also Kinnett*

*Dairies, Inc. v. Farrow,* 580 F.2d 1260, 1270 (5th Cir.1978); *Allen M. Campbell Co. v. Lloyd Wood Construction Co.,* 446 F.2d 261, 265 (5th Cir.1971). In an affidavit filed with defendant's opposition to plaintiff's summary judgment motion, the Secretary of DOE stated that "it has been the consistent practice of the Secretary ... to delegate source selection authority in major procurements to those officials of the Department ... whose technical expertise ... best suited them to act as the source selection official in any specific procurement." [22] The court does not find this interpretive practice to be either "clearly erroneous" or "inconsistent with the regulation."

The second factor the court finds persuasive involves other related DOE Procurement Regulations. Section 9–1.008(b) states in part: "Procuring activities have the authority to establish the review and approval levels for various procurement actions ... up to the dollar authority level *delegated to that organization by the head of the agency...*." [Emphasis added.] A "procuring activity" is defined in § 9–1.205 as a "DOE organizational element *which has been delegated authority by the Senior Procurement Official, Headquarters, to award contracts.*" [Emphasis added.] It is, therefore, clearly contemplated that various types of contract authority will be delegated. Even absent § 7252, it would defy reason and logic to suppose that the Senior Procurement Official can delegate authority to award contracts where the Secretary himself could not.

Because of the court's understanding of the plain meaning of § 7252, and the weight of the two factors discussed above, this court holds that the delegation of source selection authority to the Source Selection Official for this procurement was valid. [23] Moreover, it is undisputed that

---

**22.** Affidavit of Donald P. Hodel, Secretary of DOE, ¶ 3.

**23.** In defendant's Supplemental Memorandum, filed December 14, 1983, defendant informed the court that the Secretary of DOE had rescinded § 9–3.805–50, *see* 48 Fed.Reg. 54009 (Nov. 30, 1983), and submitted affidavits by which the Secretary's delegation of authority to

the Source Selection Official was ratified. Whatever the legal validity, motives, or retroactive effect of that rescission and ratification may be, it has no effect on this court's holding. The court is satisfied that, *at the time the selection decision was made,* the official making that decision had valid authority to make it.

such a delegation took place, and plaintiff has not demonstrated any resulting harm resulted from such delegation. Therefore, plaintiff's Motion for Summary Judgment, resting as it does on this issue alone, is denied.

### B. Defendant's Cross-Motion for Summary Judgment

Although plaintiff's Motion for Summary Judgment involved only the single issue of authority, defendant's cross-motion requested summary judgment as to the remaining allegations of plaintiff's Complaint. During oral arguments and in the briefs, these allegations were referred to as raising a "fairness" issue, and, for convenience, the issue will be referred to as such herein.

### 1. Plaintiff's Allegations

In its Complaint, PRC made three allegations of arbitrary or capricious actions taken by DOE during the procurement process which would, if proven, mandate at the least that the procurement be ruled invalid even if the selection decision were itself found valid. These allegations, stated in ¶¶ 23–25 of the Complaint are: (1) that "the conduct of the procurement was calculated to favor Calculon, the incumbent, and to preclude meaningful competition from PRC [and therefore] DOE did not adequately advise PRC of perceived deficiencies in PRC's proposal, in violation of law;" (2) that "DOE's other actions in effectively eliminating Federal Electric as a subcontractor to PRC after initial proposals were submitted were calculated to ensure award to the incumbent contractor, Calculon;" and (3) that "DOE did not fairly evaluate PRC's proposal and improperly downgraded said proposal ... [and] did not downgrade Calculon's proposal commensurate with the admitted deficiencies therein."

PRC bases these allegations, respectively, on allegations contained elsewhere in the Complaint that: (1) DOE did not ask PRC for further clarification regarding its corporate experience in the relevant areas, the lack of substantiation for such experience later proving fatal to PRC's proposal; and (2) DOE amended the Organizational Conflict of Interest Clause in such a way as to make it economically unwise for PRC's proposed subcontractor to actually enter a subcontract with PRC. The Complaint alleges no facts which might show anything in regard to "improper" or disproportionate downgrading.

### 2. The Discovery Issue

Upon receiving defendant's cross-motion, PRC filed a response generally stating that it could not adequately answer the motion without being granted discovery. Counsel for PRC had requested access to the Administrative Record ("Record") and was denied.[24] Counsel also filed an affidavit pursuant to RUSCC 56(f) to the effect that he could not justify his opposition without discovery.

Defendant, in strenuously opposing any discovery, stated three general reasons why discovery should not be allowed. The first was that the information plaintiff sought to discover was confidential. *See* 41 C.F.R. § 9–3.150–2. Defendant contended that the confidentiality should be preserved because: (1) PRC and Calculon often competed for the same contracts and therefore should not be allowed to inspect each other's proposals on this contract; (2) DOE had yet to negotiate with the successful bidder, and access to the information would give that bidder an unfair advantage in negotiating; (3) if a re-competition were ordered, it could not be conducted fairly after disclosure of the information; (4) such disclosure would have a chilling effect on the candid nature of the evaluation process; and (5) the two firms initially eliminated from the procurement were entitled to protection, yet were not represented herein.

---

**24.** Defendant and intervenor vigorously opposed plaintiff's motion for access to the administrative record, averring that plaintiff was merely on a "fishing expedition", since plaintiff had not asserted any specific acts of misconduct, illegality, or bad faith on the part of government officials.

Defendant's second contention in opposition to discovery was that the sheer bulk of the Record would make any filing or copying of the Record unduly onerous on defendant.

Defendant's third contention was that PRC was not entitled to access to the Record. Defendant contends that the procurement could only be ruled invalid if it were found to be irrational, and that the rationality should logically be judged on the Selection Statement issued by the Source Selection Official. PRC had been sent a copy of that. Statement in early October, and its case should stand or fall on that Statement.

In ruling on this issue, the court found *Camp v. Pitts* [25] instructive. Therein, the plaintiff alleged that the Comptroller of the Currency's decision not to authorize plaintiff's to establish a new National Bank was arbitrary and capricious. The district court granted summary judgment for the defendant, and the Court of Appeals reversed, stating that the Comptroller's justification for his decision was unacceptable. The appellate court ordered the lower court to conduct a trial *de novo*. The Supreme Court, in reversing that decision, stated: "In applying [the standard of "arbitrary, capricious, . . . abuse of discretion, or otherwise not in accordance with law"], the focal point for judicial review should be the administrative record already in existence. . . ." 411 U.S. at 142, 93 S.Ct. at 1244. *See also Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971).

This Court therefore ordered the defendant to file the Record under seal, having first excised the technical proposals themselves and any material relating to the two bidders eliminated earlier and having encoded the names of the evaluators. The court also set aside four days for the purpose of evidentiary hearings.

Plaintiff and intervenor filed Motions for Reconsideration of the Protective Order; the former asking for a less restrictive ruling, and the latter for a more restrictive order. At oral argument on these motions, plaintiff indicated that it intended to depose several officials and employees of DOE. Defendant's counsel orally moved for a second protective order denying plaintiff the opportunity to take depositions of anyone connected with DOE. Defendant's grounds for its motion were that this court's review was limited to the Record, and that plaintiff could ascertain facts from the Record, leaving only the question of the mental processes of the evaluators.

The issue of whether or not to allow the taking of depositions caused the court some concern. The Supreme Court has clearly stated that the rules governing discovery are to be liberally applied:

> We agree, of course, that the deposition-discovery rules are to be accorded a broad and liberal treatment. No longer can the time-honored cry of "fishing expedition" serve to preclude a party from inquiring into the facts underlying his opponent's case. Mutual knowledge of all the relevant facts gathered by both parties is essential to proper litigation. To that end, either party may compel the other to disgorge whatever facts he has in his possession.[26]

The Court, however, also added a *caveat* to its discussion of the breadth of discovery, *viz.:* "But discovery, like all matters of procedure, has ultimate and necessary boundaries. * * * * [L]imitations come into existence when the inquiry touches upon the irrelevant or encroaches upon the recognized domains of privilege."[27] In its objection to the taking of depositions, defendant stressed both of the "boundary markers" mentioned by the Supreme Court. First, defendant argued that any facts found outside the Record would not be relevant to the issue of bad faith or abuse of

---

**25.** 411 U.S. 138, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973).

**26.** *Hickman v. Taylor,* 329 U.S. 495, 507, 67 S.Ct. 385, 392, 91 L.Ed. 451 (1947).

**27.** *Id.* at 507–508, 67 S.Ct. at 391–392.

discretion, because the SEB members (the proposed deponents) did not make the selection, nor even recommend one bidder over the other. Defendant also argued, correctly, that any question asked in an attempt to probe the mental processes of the SEB members was improper.[28] Therefore, according to defendant, discovery should be curtailed in this instance despite the broad holding of *Hickman*.

Defendant also contended that, in any event, this court could not go beyond the administrative record. It is true that the Supreme Court, in *Overton Park, supra,* stated:

> [W]here there are administrative findings that were made at the same time as the decision [made by the agency], ... there must be a strong showing of bad faith or improper behavior before such inquiry may be made. But here there are no such formal findings and it may be that the only way there can be effective judicial review is by examining the decision-makers themselves.[29]

Plaintiff's stated purpose for taking depositions was to determine (1) the reason for various gaps and discrepancies in the Record and (2) whether anyone other than SEB members or DOE personnel had any influence on the SEB's evaluations.[30] There were no formal findings on these issues, and *Overton Park*'s restriction was thus inapposite. On the contrary, there is case law handed down by this court's predecessor to the effect that, in an appropriate case, *de novo* evidence can be admitted in an action involving an agency determination.[31]

Faced with this welter of countervailing considerations, the court carefully weighed the competing interests. Discovery is generally accorded a very liberal scope, *Hickman, supra,* which is especially important where, as here, one party is in sole possession of almost all of the relevant facts. On the other hand, plaintiff had yet to make a showing sufficient to overcome the *Overton Park* strictures and allow PRC to probe the mental processes of the evaluators. Moreover, defendant's argument regarding the chilling effect such discovery might have is well-taken. It is quite reasonable to assume that an evaluator, who knows that, should a dispute later arise, every thought occurring to him during the evaluation process may be made public, will be very reluctant to engage in the free-association and communication with others necessary to effective decisionmaking. Courts should be reluctant to dissuade such candor in any way.

Two other factors were more specific to this case. The first was that the discovery question had been closely and vigorously contested throughout this action. Plaintiff had made discovery requests at the time it filed its Complaint, and continued to press for ever broader discovery thereafter. Defendant and intervenor had strenuously objected to any discovery. In light of the considerations mentioned above, this continuous dispute, and the fact that the line separating the relevant from the irrelevant and the privileged from that which is not

---

**28.** *United States v. Morgan,* 313 U.S. 409, 418, 61 S.Ct. 999, 1003, 85 L.Ed. 1429 *ad fin.* (1941) (*Morgan IV*).

**29.** 401 U.S. at 420, 91 S.Ct. at 825.

**30.** Plaintiff's first area of inquiry arose from the fact that although five SEB members were to have made individual evaluations of the proposals, and were provided rating sheets on which to record their evaluations, only some of those rating sheets were found in the record. Also, a schedule of SEB meetings indicated that some meetings were scheduled to take place after September 2, but no minutes of such scheduled meetings were in the Record. Furthermore, an undated hand-written chart showing how the five individual evaluators rated the bids according to the listed criteria, did not accurately reflect the ratings found on at least one set of individual rating sheets that was included in the Record as filed by defendant. The basis for plaintiff's second area of inquiry is not clear.

**31.** *See Brown v. United States,* 396 F.2d 989, 184 Ct.Cl. 501 (1968); *Beckham v. United States,* 375 F.2d 782, 179 Ct.Cl. 539, *petition for writ of certiorari dismissed by stipulation,* 389 U.S. 1011, 88 S.Ct. 583, 19 L.Ed.2d 613 (1967). Decisions of the United States Court of Claims are binding precedent for the Claims Court. General Order No. 1, 1 Cl.Ct. xxi (1982).

privileged, is so often mere gossamer, made it apparent that any unsupervised deposition could too easily become merely a legal dispute rather than a discovery device.

The final, and resolving, factor was the four-day evidentiary hearing scheduled by the court in its Order of November 18. Defendant's voluntary postponement of any award of the contract made such a hearing possible. Any question of relevance or privilege could be quickly answered, and the taking of pertinent evidence could proceed apace. This court therefore allowed plaintiff to depose the contracting officer only and restricted the areas of permissible inquiry to those of fact only. Any questions beyond the scope of that Order, and any objections raised at the deposition could be efficiently resolved at the scheduled hearing.

Finally, it should be made clear that the rulings on discovery in this case were completely dependent on the particular facts herein. The court's holdings should not be taken to mean that the court will rule the same way in subsequent cases. The court believes that it would be opening a Pandora's box of frivolous lawsuits intended only to gain access to the full administrative record or to delay or unduly burden agency actions were the court to rule that *any* disgruntled, unsuccessful bidder could gain access to the record merely by alleging some irregularity in the procurement process.[32] Such *carte blanche* access to the administrative record is not intended. Throughout this action, the court has been acutely aware of the magnitude of the contract at stake and the relative positions of the parties, and has ruled accordingly. This case has from its inception presented somewhat unusual and unexpected circumstances, and the rulings herein are strictly limited to this case.

3. The Merits

■ a. PRC alleged in its Complaint that DOE's procurement procedures were "calculated to favor . . . the incumbent . . . and to preclude meaningful competition from PRC. . . ." Although it is unclear what is exactly meant by "calculated," it is more than clear that PRC has produced no evidence of any favoritism. Nothing in the Record or in the affidavits offered by the parties indicates that at any time did Calculon have any greater opportunity to compete than did PRC, nor is there any evidence showing a preference for either competitor until the actual selection decision.

■ Plaintiff further alleges that DOE "did not adequately advise PRC of perceived deficiencies in PRC's proposal, in violation of law," but does not point out any statute or regulation requiring DOE to so advise bidders. According to 41 C.F.R. § 9–3.805–1(c), a contracting officer is obligated to point out any "ambiguities or uncertainties," but is not under a similar obligation with respect to deficiencies. Without an indication of uncertain or ambiguous language in the RFP, the absence of a particular supporting factor in a bid can reasonably be assumed to stem from absence of that factor from the bidder. A procuring agency may have some obligation to establish evaluation criteria, which DOE clearly did in this case, but it would be absurd to suppose that the agency thereafter has an obligation to ensure that all bidders meet those criteria. The very purpose of competitive bidding is to determine whether and how well a particular bidder meets established criteria. *See, e.g., Harris Data Communications, Inc. v. United States,* 2 Cl.Ct. 229 (1983) [NETTESHEIM, J.], wherein the court held that the Navy did not abuse its discretion in eliminating from consideration a bid lacking certain specifically required information.

■ Assuming *arguendo* that DOE did have some obligation to inform plaintiff of "perceived deficiencies" in its bid, it is clear that DOE did so inform plaintiff. In a

---

**32.** As discussed above, such naked allegations are merely the minimum prerequisite for jurisdiction. This court does not retreat from its previous holding that a plaintiff making such allegations carries a "heavy burden" in substantiating such allegations. *See MWK International, Ltd., Inc. v. United States,* 2 Cl.Ct. 206, 208 (1983) [SETO, J.].

letter dated July 15, 1983, in which DOE informed PRC that PRC's proposal was within the competitive range, DOE requested written answers to several questions. Nine of these questions were directly addressed to the area of "Related Experience," plus at least four questions concerning proposed personnel requested further information on personnel experience in various fields of expertise. From the Selection Statement's discussion of corporate experience, it is clear that PRC either did not or could not satisfactorily answer the questions posed in the July 15 letter. There is no substantiation whatever for an allegation of bad faith or illegality with respect to this portion of the Complaint.

■ b. PRC's second allegation of illegality or bad faith concerns the amendment of the Organizational Conflict of Interest Clause. It is alleged that the amendment was "calculated" to harm PRC or favor Calculon by eliminating PRC's proposed subcontractor from the competition. Again, no evidence of bad faith or abuse of discretion has been shown. DOE's reason for the amendment was clearly rational. DOE planned to make large purchases of telecommunications equipment. The type of equipment bought would depend in large part on the system to be developed under the contract, and the contractor would be expected to evaluate such equipment. DOE clearly could not allow a company to first participate in the planning of a system and then later bid on a contract to supply the equipment for such a system. To do so would violate both statutes and regulations governing conflicts of interest in Government contracts.[33] PRC's contention that the amendment favored its competitor is also unrealistic in light of the fact that PRC's amended bid, without its initial subcontractor, was rated higher in pertinent areas than was the bid as originally submitted.

■ c. PRC's final contention in its Complaint is an allegation that its proposal was improperly downgraded, and Calculon's proposal was not downgraded commensurately for "admitted deficiencies." Plaintiff has shown no proof that this occurred. The Selection Statement noted that both proposals contained some deficiencies, but also said that both technical proposals were "sound." It is clear from the Statement that the final decision was between two very able, competent companies; it is also clear that, in at least one area, Calculon's proposal was considered to be superior to PRC's. There is nothing to show an "improper downgrading," nor, indeed, that Calculon's "admitted deficiencies" were at all decisive.

d. Plaintiff added one more string to its bow, however. In its deposition of the contracting officer, PRC discovered that some of the charts used by the SEB in reaching a final consensus on its ratings of the proposals had been destroyed. Plaintiff contends that this destruction violated § 705 of the "Procurement Regulations Handbook—Source Evaluation Board" (the "SEB Handbook"), and that by so doing, DOE violated 41 C.F.R. § 9–3.805–50(b), which states in pertinent part:

> Source evaluation board (SEB) procedures *shall be used* for all negotiated competitive prime procurements expected to exceed $5 million.... Detailed *guidance* regarding the designation and operation of the SEBs are set forth in the SEB Handbook.... [Emphasis added.]

Plaintiff argues that this regulation, when read in conjunction with subsection (c) of that regulation ("[P]rocurements equal to or below $5 million are not subject to the SEB Handbook...."), mandated full compliance with the SEB Handbook for the procurement in issue.

---

33. *See* 15 U.S.C. § 789; 42 U.S.C. 5918(a) ("Such person shall insure ... compliance with this [conflict of interest] section by subcontractors...."); 41 C.F.R. §§ 9–1.5401 *ad fin.* PRC's proposed subcontractor was a subsidiary of International Telephone and Telegraph.

Rather than be bound by the Organizational Conflict of Interest Clause of the current contract, thus prohibiting both itself and its parent from bidding on the supply contract for the equipment, the subsidiary withdrew its proposed subcontract.

▮▮▮

▮▮▮ Plaintiff must clear three hurdles with regard to this contention: First, it must be shown that the Handbook is indeed incorporated by reference within the regulation so as to have the force and effect of law; second, plaintiff must show that the particular section of the Handbook on which it relies was in fact violated; and third, it must be shown that the violation was "clear *and prejudicial.*" [34]

It is not clear that plaintiff can surmount any of the three hurdles. The regulation clearly contemplates that SEB "procedures shall be used," but does not set forth those procedures other than to refer to the SEB Handbook for "guidance." There exists an apparent conflict between the use of the mandatory term "shall" and the much less restrictive term "guidance." The conflict, if it indeed exists, is easily resolvable. First, it is somewhat nonsensical to suppose that a detailed, as opposed to general, set of procedures would be fair and workable if such procedures were strictly enforced with regard to the wide variety of negotiated contracts worth over $5 million. Furthermore, the agency itself has not interpreted the regulation as mandating the strict application of the SEB Handbook. Such an interpretation by the agency is entitled to great weight.[35] The DOE SEB Secretariat, who is "responsible for all SEB administrative policies and procedures," [36] has stated by way of affidavit that:

> [The SEB Handbook] is not a formal regulation, but, rather, states the overall objectives of the procurement process and provides a framework, within which each SEB may develop its own evaluation plan and working procedures for its specific procurement. The forward of the SEB Handbook recognizes that the source evaluation and selection process often re-

quires the development of specific procedures for each SEB, within the overall guidance presented. It therefore provides that the SEB Chairperson may make "appropriate variations and adaptations that are necessary in individual situations." [37]

Plaintiff, however, also contends that even if the SEB Handbook is not incorporated by the regulation, it still has the force and effect of law for this procurement because the RFP stated that the Handbook procedures would be used.[38] Plaintiff's argument is misdirected. It is not contended by defendant that the Handbook procedures do not apply, but rather that the procedures are general policies, and may be adapted (within limits) to the particular procurement at hand. The agency's interpretation is rational, and is not "plainly erroneous" or "inconsistent with the regulation." [39]

The second hurdle plaintiff must surmount is whether the particular section of the Handbook was indeed violated. Plaintiff argues that § 705 of the Handbook, entitled "Transfer/Disposal of Files," was violated by the destruction of certain charts used by the SEB in reaching a consensus regarding the various ratings given the proposals. This section reads as follows:

> During the course of its activities the board will accumulate certain data or documentation. Such documentation, or back-up material, will normally include; [sic] summaries of board meetings, the RFP, proposals, working papers, such as rating or scoring sheets and checklists, and committee reports. These papers constitute the basis for the board report and will be preserved. After the board has completed its activities, the official

---

**34.** *See Heli-Jet Corp., supra,* 2 Cl.Ct. at 616 [Emphasis added.]

**35.** *See Udall v. Tallman,* 380 U.S. 1, 16–17, 85 S.Ct. 792, 801–802, 13 L.Ed.2d 616 (1965) ("the administrative construction of [a] regulation ... [is] of controlling weight unless it is plainly erroneous or inconsistent with the regulation.")

**36.** Affidavit of Gary C. McKinney, ¶ 1.

**37.** *Id.,* ¶ 3.

**38.** *Dean Forwarding Co., Inc. v. United States,* 2 Cl.Ct. 559, 565–566 (1983) [HARKINS, J.] (procedures established by solicitation letter "are tantamount to regulations and are part of the implied-in-fact contract. . . .").

**39.** *Udall v. Tallman, supra,* 380 U.S. at 16–17, 85 S.Ct. at 801–802.

SEB files will be purged of excess copies of material including SEB reports and transferred to the procurement office that will be responsible for negotiating the contract. A complete copy of each proposal received will be retained in the official files. In the case of the successful offeror, additional copies of the proposal and any modifications should be retained for use during negotiation and administration of the resulting contract.

Plaintiff contends that the material that was destroyed constituted "working papers" within the meaning of the section. Although plaintiff has produced no evidence that its interpretation of this term is correct, defendant has offered a sworn affidavit to the effect that it is not:

The use of "flip charts" and similar methods, such as blackboards, of presenting both individual and group ratings, is not uncommon among SEB's, and is, in fact, encouraged by the SEB Secretariat as a visual aid to facilitate the deliberative process.

The information on such charts is customarily summarized and recorded by the Executive Secretary of each SEB, to be used in written and oral discussions with the offerors and in preparation of the SEB's report. *It has been the consistent policy of the SEB Secretariat that such charts do not constitute "working papers" within the meaning of section 705 of the SEB Handbook. Therefore, there is no requirement to retain these charts.*

\* \* \* \* \* \*

[The destruction of the charts used in the CSTM procurement] was, in my view as SEB Secretariat, completely proper and not inconsistent with the SEB Handbook.[40]

The court finds nothing improper about this procedure. There is competent evidence indicating that the Handbook is viewed as only a set of guidelines and not as an unvaried and invariable procedure. There is further evidence that the procedure used to evaluate the proposals for this procurement comported with the procedures used in other procurements. Given the stark absence of any evidence of irrationality, abuses of discretion, or illegality, this court will not invalidate that procedure.

In any event, plaintiff has failed to overcome the third and last hurdle. Even if there has been an illegal action, it must be proven to have been prejudicial. PRC has proffered no evidence that the destruction of any documents caused PRC any harm. Defendant, on the other hand, has filed affidavit evidence that the scores recorded on the subsequently destroyed charts were accurately transferred to summary sheets, which sheets are in the Record.[41] As to any individual rating sheets that are missing from the Record, PRC has not proven any ill-effect stemming from the absence thereof. The function of the SEB was to determine consensus ratings for each proposal; this determination was a dynamic process, during which the members' opinions and ratings could, and probably did, change many times. Finally, however, agreement was reached, with all SEB members concurring.[42] PRC is able to show no taint at any point in the process by which the agreement was reached.

Plaintiff has not substantiated any of the allegations contained in its Complaint. It has pointed to minor technical procedures that may or may not have been violated, and from there infers bad faith or illegality on the part of DOE. It has proven no prejudice other than the prejudice suffered by all disappointed bidders—that of not obtaining the contract. Any other prejudice must be inferred if it is to be found. This court has been instructed that "inferences of actual or potential wrongdoing" based on "suspicion and innuendo" are insufficient if "not supported by the record." The re-

---

**40.** Affidavit of Gary C. McKinney, ¶¶ 6, 7, 8 [Emphasis added].

**41.** Affidavit of Gerald C. Chappell, ¶ 5.

**42.** The final draft of the SEB report was signed by each of the SEB members to indicate their concurrence in the contents of the report. *See, e.g.,* Affidavit of David K. Berkau, ¶¶ 4 and 9, and Attachment.

quirement is to consider only "hard facts."[43] PRC has utterly failed to show any "hard facts" indicating any wrongdoing by DOE, and its Complaint must therefore be dismissed.

One other aspect of this case warrants comment by the court. As has been noted, defendant and intervenor have strenuously and continuingly objected to the scope of discovery granted plaintiff.[44] At each instance, the court carefully considered the objections and, despite the weight and vehemence of the objections, granted almost all of plaintiff's request. The court believes that a plaintiff should be given every reasonable opportunity to bring forth the facts, especially in light of the heavy burden of proof plaintiffs bear in a case of this sort. It was the court's firm belief that, in view of the many arguments and counter-objections made by the parties, a full evidentiary hearing would be the best and most efficient tool for hearing testimony and dealing with objections. It was to that end that the court scheduled such a four-day hearing. To the surprise of the court and the other parties, plaintiff did not take advantage of this hearing. It is, of course, not this court's responsibility or desire to engage in speculation regarding plaintiff's legal strategy. The court, however, believes it must make clear one particular point. In discussing the reasons for not taking advantage of the scheduled four-day hearing, plaintiff's counsel stated:

> I made two assumptions. The first was that the Court would issue a consistent ruling. If the Court granted the protective order to preclude me from taking depositions, I have absolutely no grounds for presuming that the Court wouldn't have issued a similar ruling with respect to testimony. There is no way to distinguish between them.

> \* \* \* \* \* \*

I simply thought in good faith that the same decision that was made on discovery would be applied to the trial.[45]

This court has not been shown, and is not aware of, any decision of other courts or statutes or rules that support this view. RUSCC 26(b)(1) states that a party is entitled to discover relevant information which may not be admissible in evidence. Conversely, discovery may be limited by a protective order, whereas testimony, safeguarded by the presence of a judge and preserved verbatim by a recorder, would *not* be so limited. In this case, the court believed that there existed cogent reasons for limiting discovery, which reasons would not necessarily have held true in an evidentiary hearing. This court recognizes that attorneys properly must, and do engage in speculation regarding pending decisions in planning the presentation of a case. Doctrines such as "the law of the case" are designed to improve predictability in order to aid counsel. Where such a doctrine does not apply, however, as was the case here where a ruling on a discovery issue did not restrict a ruling on a testimonial issue in a different context, counsel speculates at its own risk. Counsel cannot later be heard to repine when such speculation subsequently proves to be erroneous.

CONCLUSION

After a careful review of the motions, the other briefs filed by the parties, the affidavits, the Administrative Record, and the transcripts of the oral arguments presented in this case, this court finds:

1. That the selection made in this procurement was made by a person duly authorized to make that selection; and

2. That there is no concrete evidence of any wrongdoing on the part of the

---

**43.** *CACI, Inc.—Federal, supra,* 719 F.2d at 1582.

**44.** *See* Transcript at pp. 93–106, 109–122, 134–149.

**45.** Transcript at pp. 290–291, 293.

agency or of the personnel involved in this procurement.

Therefore:

1. Plaintiff's Motion for Summary Judgment is DENIED;

2. Defendant's and intervenor's Cross-Motions for Summary Judgment are GRANTED;

3. Intervenor's Counterclaim is to be DISMISSED; and

4. Plaintiff's Complaint is to be DISMISSED.

IT IS SO ORDERED.